**TELECTRON, INC., Plaintiff,**

v.

**OVERHEAD DOOR CORPORATION, Defendant.**

**No. 79–1788–Civ.**

United States District Court, S.D. Florida.

June 4, 1987.

---

William J. Dunaj, Philip A. Allen, III, Mershon, Sawyer, Johnston, Dunwody & Cole, Miami, Fla., for plaintiff.

William B. Killian, John M. Barkett, Steel Hector & Davis, Miami, Fla., for defendant.

MARCUS, District Judge.

The issue squarely presented by this case is what sanction should be imposed for the flagrant and willful destruction of records specifically called for in a production request served upon the Defendant in a complex antitrust case. We undertake this inquiry pursuant to a Renewed Motion for Default Judgment and Sanctions, filed by the Plaintiff on October 28, 1985.[1]

The Defendant, Overhead Door Corporation (hereinafter "OHD"), is engaged in the manufacture and nationwide distribution of garage doors, garage door operators, and related products. The Plaintiff, Telectron, Inc. (hereinafter "Telectron"), is a manufacturer of radio receivers and transmitters which, until the early 1970's, were commonly sold by OHD distributors as companion equipment for OHD door operators. On April 10, 1979, Telectron filed a Complaint, alleging that OHD, after its 1971 acquisition of Advance Industries, a company engaged in the manufacture of radio controls, undertook various measures to induce OHD distributors to purchase Advance radio controls rather than Telectron controls, in violation of this nation's antitrust laws.

On March 12–13, 1986, a hearing was held before this Court to give the Parties an opportunity to present testimonial and documentary evidence bearing upon Plaintiff's Motion for Default and Sanctions. The principal players in this discovery drama appeared and gave testimony at the hearing. Numerous depositions were also presented, along with a variety of supporting documentary evidence.[2]

From the array of evidence brought before this Court, it is disturbingly apparent that Mr. Richard B. Arnold, the Secretary and Corporate Legal Counsel to OHD, ordered the immediate destruction of documents directly pertaining to Plaintiff's Complaint and Request for Production, on the very day that these papers were served personally upon him. The evidence also establishes beyond any real doubt that Mr. Arnold ordered this destruction in a willful and

---

1. When originally filed on April 10, 1979, this case was assigned to the Hon. Norman Roettger, United States District Court, Southern District of Florida. The instant motion was first filed by Plaintiff in 1982. On October 7, 1985, Judge Roettger denied Plaintiff's Motion for Default and Sanctions "without prejudice." On the same date, the case was reassigned to this Division of the Court. Plaintiff renewed its Motion for Default and Sanctions on October 28, 1985. In view of the nature and gravity of Defendant's alleged discovery abuses, we set this matter down for full evidentiary hearing and reconsidered the issue *de novo.*

2. We note that both Parties have submitted lengthy briefs on this matter, amply addressing the disputed events and their legal significance. In view of the allegations raised and the findings entered, we additionally observe that Defendant's present counsel have been consistently forthright and honorable in enlightening this Court as to this unfortunate and sadly avoidable course of events.

intentional attempt to place documentation which he anticipated to be damaging to OHD's interests in this litigation forever beyond the reach of Telectron's counsel. Specifically, Mr. Arnold called for the immediate destruction of all sales correspondence, over two years old, generated by OHD's Advance radio control division. Given the repeated and prominent references to Advance in both the Complaint and the Request for Production, and given the centrality of that plant's product to Telectron's allegations of exclusive dealing, illegal tying, attempted monopolization, and tortious interference with an advantageous business relationship, we cannot escape the conclusion that Mr. Arnold's directive was specifically designed and intended to obscure OHD's history of anticompetitive endeavor, and to impede and obstruct Telectron's right to an honest and open discovery process. Sadly, we can only conclude on this ample record that the Defendant intentionally meant to prevent the full and fair adjudication on the merits of this serious case.

It is also abundantly clear that numerous documents were destroyed in direct and immediate response to Mr. Arnold's directive; the testimony of several employees at the Advance plant reveals in no uncertain terms that such destruction occurred. While it is now impossible to determine precisely what the destroyed documents contained or how severely the unavailability of these documents might have prejudiced Plaintiff's ability to prove the claims set forth in its Complaint, we find OHD's contention that no significant prejudice has resulted from this pattern of destruction to be wholly unconvincing. The inescapable fact is that documents falling within a category directly pertinent to Telectron's claims *were* destroyed, willfully and intentionally, under urgent orders of OHD's chief legal officer and secretary in the immediate aftermath of his receipt of Telectron's Complaint and Request for Production. Moreover, this same corporate officer lied in his testimony before this Court, in an obvious attempt to conceal his role in instigating this premeditated destruction.

In reviewing the range of potential sanctions available to this Court, we have concluded that no sanction less than the entry of default judgment as to Defendant's liability can fairly and adequately redress this willful obstruction of the discovery process. We are fully aware of the enormity of this sanction, but we find that all lesser sanctions such as the imposition of attorneys' fees and court costs, evidence preclusion, and other similar measures, standing alone or in the aggregate, would neither ensure this Plaintiff's basic right to a fair trial nor provide a truly meaningful deterrent to future acts of willful disregard for our rules of discovery. In short, we have determined that the entry of default as to OHD's liability is a sanction precisely proportionate to the Defendant's conduct. Accordingly, it is hereby

ORDERED AND ADJUDGED as follows:

1. Default Judgment is hereby entered as to Defendant's liability for "exclusive dealing" under Section 3 of the Clayton Antitrust Act and Section 1 of the Sherman Antitrust Act (Count I); for engaging in illegal tying arrangements under the same sections of the Clayton and Sherman Acts (Count II); for attempted monopolization of sales in violation of Section 2 of the Sherman Act (Count III); and for tortious interference with an advantageous business relationship (Count IV).

2. Defendant shall also bear all reasonable attorneys' fees expended by Plaintiff in preparing its Motion for Default Judgment and Sanctions, as well as all court costs related to this Motion.

As Defendant's liability under Counts I through IV of the Complaint is hereby established, the sole remaining issue to be litigated as to these Counts is the extent to which Plaintiff's business was actually damaged by Defendant's anticompetitive actions.

In view of the flagrant and contumacious behavior of the Defendant and the sweeping remedy which we have fashioned, we have felt constrained to set forth the facts

and law pertaining to this matter in considerable detail. The bases for the Court's rulings are discussed below.

## I. *Findings of Fact*

The significance of the document destruction ordered by Mr. Arnold in April 1979 can best be appreciated when viewed within the context of OHD's previous recent history as a defendant in a number of antitrust-related suits. The factual findings below briefly describe OHD's so-called "one-for-one" program, which allegedly involved the induced parallel purchase by OHD distributors of OHD door operators and Advance radio controls. OHD's involvement in this sort of arrangement had resulted in a substantial judgment against the corporation in at least one antitrust suit which had concluded just a few months before Telectron filed its Complaint. OHD's receipt of Telectron's Complaint occurred, in fact, during Mr. Arnold's first months as corporate secretary and legal counsel, at a time when he was busy coordinating the destruction of documents in the wake of OHD's previous antitrust litigation.

In addition to looking at the circumstances preceding the discovery violation at issue here, we have examined in some detail the manner in which Mr. Arnold's order to destroy sales-related records at Advance was communicated, the extent to which it was followed by officials at the Advance division, and the failure of OHD's top management to take decisive action once the issuance of this order had been revealed. Emerging from this set of facts is a clear picture of willful and prejudicial discovery abuse, requiring imposition of the strictest of sanctions.

### A. *History of Overhead Door's "One-for-One" Program*

Since prior to 1962, Telectron has been in the business of manufacturing and selling radio receivers and transmitters (hereinafter "radio controls") used to activate

electric garage door operators which open and close overhead doors. [Complaint, ¶ 5.] OHD is a manufacturer of garage doors, garage door operators, and related products which it sells through a nationwide network of approximately 385 independent distributors. [Tr. 10, 418b.] [3]

In November 1971, OHD acquired a formerly independent company, Advance Industries ("Advance"), located in Appleton, Wisconsin. [Complaint, ¶ 18.] Advance, like Telectron, was then in the business of manufacturing radio controls to be used in conjunction with electric garage door operators. At the time of its acquisition by OHD, Advance sold these radio controls both to the manufacturers of garage door operators and to garage door dealers. [Tr. 8–9.]

Prior to the acquisition, OHD's distributors primarily sold Telectron radio controls. [Tr. 11.] Thereafter, OHD allegedly initiated a policy intended to curb competitive buying of radio controls by OHD distributors. [Tr. 23.] Specifically, the program was intended to discourage OHD distributors from buying radio controls manufactured by Advance's competitors, and to promote the matched sale to distributors of OHD garage door operators and Advance radio controls. [Tr. 23.]

The inception of this program is documented by various memoranda prepared by OHD's sales managers in February and March of 1972. On March 13, 1972, OHD's General Sales Manager, Robert Hayman, sent a memorandum to OHD distributors which declared in relevant part:

> The period of March 20 to April 15 will be a period of balancing, to let you get your operators-radio inventory in line. Starting April 15, 1972, Advance radio controls will become standard equipment with our Models 80 and 85 operators and shipped from our plants on a one-for-one basis (one operator-one radio control).

---

**3.** This and all subsequent "Tr." citations refer to the transcript of the evidentiary hearing which was held on March 12–13, 1986.

[Plaintiff's Ex. 2, Item 1.] In an Overhead Door "Product and Pricing Bulletin" attached to this memorandum, distributors were advised: "If you have not already done so, we urge you to make the change over to Advance equipment now." [Plaintiff's Ex. 2, Item 2, Overhead Door Product and Pricing Bulletin No. 329 (March 13, 1972).]

A month before the above-quoted memorandum and bulletin were sent out to distributors, John Lieber, Sales Manager of OHD's Electric Operator Division, circulated an internal memorandum to OHD's Division and District Sales Managers, apprising them of the soon-to-be-announced program and stating that its purpose was "to get the distributors buying Advance." [Plaintiff's Ex. 3, Item 1 (Inter-Office Correspondence dated February 16, 1972).] Anticipating that certain distributors might not readily accept the matching of OHD operators with Advance radio controls, Mr. Lieber warned his sales managers:

You may get some flak from distributors regarding the price [of the Advance radio controls] not being as good as Telectron. We feel that for all distributors concerned we should use a one price pricing program, and with the added features, we are more than in line. . . . To go along with this program, and to get the distributors buying Advance, we are planning to inventory the [Advance] 702, 600, and 1000–1003 radios at the plants.

[Id.] OHD's eventual goal following a period of transition was made clear:

A grace period will be allowed at the start of the . . . program to allow for balancing stocks, but at the end of that time, we will expect to ship [OHD] operators 80 and 85 with radio controls as a package, on a 1 for 1 basis.

[Id.]

Maynard Geske, Advance Industries' Sales Manager at the time, remembered having seen the March 13 communication from Robert Hagman just a few days after it was authored. [Tr. 42.] While he did not specifically recall having received John Lieber's February 16 memorandum, he acknowledged that he routinely received documents of this kind from OHD and "undoubtedly" did receive this particular memorandum. [Tr. 42, 46.] He further recalled attending an OHD meeting in the Bahamas at which OHD's President, Robert Haugh, discussed the need to "crack down on competitive buying." [Tr. 23–24; Geske Dep. at 13.] At an earlier deposition, Mr. Geske recalled that Robert Hagman, OHD's General Sales Manager, had also addressed the Bahamas meeting, urging that OHD distributors who were unwilling to be "full-line" distributors of OHD products should be replaced. [Geske Dep. at 46–47.]

Mr. Geske maintained that the so-called "one-for-one" program was not merely discussed, but was in fact implemented by OHD. Under this program, OHD distributors reportedly faced the following obligations: "[I]f they bought an operator, they were to buy a radio control. If they bought a radio control, they were to buy an operator." [Tr. 17.] The existence of a "one-for-one" program was also attested to by Harold Stevens, who found this program in place when he was hired by OHD as Field Sales Manager in the Operator Division in February 1973. [Tr. 363, 386.] Mr. Stevens, who became Assistant Sales Manager at Advance in January 1977 and then Advance's General Manager in April of the same year, played an active role in sustaining the one-for-one program. [Tr. 362–64, 377.] He acknowledged, for example, that he periodically drew up "one-for-one charts" comparing the number of radio controls and the number of operators sold to individual distributors. [Tr. 377.] Mr. Geske made apparent reference to the same charts, calling them "imbalance reports." [Tr. 43–44.]

While there is no real doubt that the "imbalance" or "one-for-one" reports were prepared, the record is inconsistent as to how the data contained in these reports was used. Testifying before this Court, Mr. Geske denied that he personally took any action if an imbalance report showed that a distributor had bought an unequal number of radios and operators. [Tr. 44.]

His earlier deposition testimony contradicted this assertion, however. At deposition, Mr. Geske acknowledged that the reports were, in fact, used for a time to persuade distributors to pair their OHD operators with Advance radios:

Q: Now, you reviewed these reports almost monthly I think you said?

A: Yes.

Q: What use did you make of them, if any?

A: The idea was to determine whether or not [distributors] were in fact buying in equal numbers or hopefully more radio controls than operators....

Q: Did you make any use of these reports in your dealings with the distributors you called on?

A: In some instances, yes, if they were not using the control the question was why.

Q: And that's how you used the report, you would say, how come you're not buying the Advance controls and would you then try to persuade them to buy the Advance controls?

A: Yes.

Q: And how did you go about that?

A: Usually a phone call and usually a sales trip....

[Geske Dep. at 40–41.]

One of the Advance personnel, in addition to Mr. Geske, who would monitor the purchasing activities of OHD distributors was Paul Buntin, a sales engineer for the division. One of Mr. Buntin's responsibilities as sales engineer was to visit with OHD distributors in an effort to promote the sale of Advance radio controls. [Tr. 97.] He would also correspond with OHD distributors for the same purpose. [Tr. 97–99.] At the evidentiary hearing before this Court, Mr. Buntin acknowledged that, in the course of his sales activity, he would occasionally learn that OHD distributors were not buying Advance radio controls. He did not, however, recall that he had ever reported such information to Overhead Door. [Tr. 111.] Impeaching this testimony, Plaintiff's counsel introduced into evidence a letter sent by Mr. Buntin to Brian Bolton at OHD, on May 17, 1977. [Plaintiff's Ex. 5.] In this letter, Mr. Buntin reported on a visit to two OHD distributors in the Midwest:

> On my recent trip to OHD Minneapolis and OHD Des Moines, I encountered a few items and facts of which I want to make you aware. The twofold purpose of my trip, which was requested by Bob Tucker, was to try and sell our line of radio controls to the above mentioned customers, plus, determine why these customers have not been buying Advance controls. I discovered the only reason both distributors are not buying controls is that we are averaging about 15% higher in selling price.

[*Id.*]

Following this introductory paragraph, Mr. Buntin proceeded in the letter to describe in some detail the purchasing practices of the Minneapolis and Des Moines distributors. He reported, for example, that the Des Moines distributor, who was buying no Advance controls at the time, had "guaranteed me that Advance would receive 100% of his business if we were 10% lower in selling price." [*Id.*] Later in 1977, a special discount was apparently arranged for this distributor. [Plaintiff's Ex. 8 (Inter-Office Correspondence from Harold Stevens, Advance's General Manager, to Robert Hagman, OHD's General Sales Manager (July 31, 1980).]

B. *Prior Antitrust Litigation and the Hiring of Richard Arnold*

On December 10, 1978, OHD hired Richard Arnold to serve as its first Corporate Legal Counsel and Assistant Corporate Secretary, while retaining his post as in-house counsel. [Arnold Dep. (December 16, 1980) (hereinafter "Arnold Dep. I"), at 8.] In February 1979, he was promoted to Corporate Secretary. [Arnold Dep. (April 21, 1981) (hereinafter "Arnold Dep. II"), at 22.] Prior to joining OHD, Mr. Arnold had held three law-related jobs in the four years since his graduation from the University of Texas Law School in 1973. [Tr.

160.] His first two jobs, with private law firms in Dallas, primarily involved real estate matters. [Arnold Dep. II at 15.] In his third job, as in-house counsel to a savings and loan holding company, he handled a variety of business-related matters although he reportedly had no occasion to develop any expertise in the area of antitrust law. [Id. at 12, 15.] In law school, however, Mr. Arnold did take a course titled "Antitrust and Regulated Industries." [Id. at 12.] At the time that he was hired by OHD, Mr. Arnold was a member of the Texas Bar Association. [Tr. 160.]

In December 1978, when Mr. Arnold joined OHD as Corporate Counsel, the company was concluding or had just concluded three law suits in which OHD had been charged with serious and substantial antitrust violations. [Tr. 164–67.] In one of these suits, *Overhead Door v. Nordpal* (U.S.Dist.Ct., Minn., Fourth Division, Case No. 4–75–Civil 523), the parties reportedly reached a settlement agreement during Mr. Arnold's first week on OHD's payroll. Earlier that fall, the jury in the *Nordpal* case had awarded a special verdict for damages against OHD, in an amount exceeding $1 million. [Plaintiff's Proposed Findings of Fact and Conclusions of Law, Appendix Item 1 (Special Verdict, October 12, 1978).] In this verdict, the jury had found that OHD had "through coercion tie[d] the purchase of one of its products to the purchase of another of its products so that Nordpal was forced to purchase products from Overhead that it did not want and would not have purchased, absent the coercion, in violation of Section 1 of the Sherman Act or Section 3 of the Clayton Act." [Id.] The jury also found that OHD had "unreasonably require[d] Nordpal to purchase products exclusively from Overhead in violation of Section 1 of the Sherman Act or Section 3 of the Clayton Act." [Id.] Finally, Overhead was found to have "unreasonably restrain[ed] Nordpal's territory in violation of Section 1 of the Sherman Act." [Id.] Pursuant to these jury findings, judgment awarding treble damages plus costs and attorney's fees was entered against OHD on October 13, 1978, in the amount of $1,081,209.00. [Id., Appendix Item 2.]

Despite the immediacy and obvious financial significance of the *Nordpal* suit to his new employer, Mr. Arnold has presented himself to this Court as largely ignorant of the substance and outcome of this litigation. [Tr. 164–68.] He expressed similar ignorance about the other two antitrust suits which concluded in approximately December 1978, referred to in the record as the "DeCicco" (or "De Seco") and "Wunderlicht" (or "Wonderlicht") suits. [Plaintiff's Proposed Findings of Fact, at 4; Tr. 164–67; Arnold Dep. II at 34–37.] His hearing testimony as to these matters, startling in its professed naivete, warrants somewhat lengthy quotation:

Q: After you began as corporate counsel and secretary of Overhead Door, did you become aware of an antitrust suit against Overhead Door called the Nordpal suit?

A: Yes, I did.

Q: Do you recall when the Nordpal suit ended?

A: Yes. It ended probably during the first week that I was on the payroll of the company.... Mid December of '78.

Q: Were there also two other antitrust suits that ended at the same time?

A: Yes, sir. Or at least ended at the District Court level.

Q: Was there a settlement in the Nordpal suit, do you recall?

A: I was not involved. I was told there was a settlement.

Q: Was there a settlement in the Wonderlicht antitrust suit?

A: I do not recall that.

Q: Was the third one called the De Seco suit?

A: It was.

Q: Was Overhead Door Corporation a defendant in all three of these antitrust lawsuits?

A: It was.

Q: Do you recall whether the antitrust claims made against Overhead Door

[in] the Nordpal suit included tying claims?

A: No. I never saw the Complaint in the Nordpal case.

Q: I didn't ask you, sir, if you saw the Complaint. I asked you if you were aware of whether the Complaint made in that case included tying claims.

A: I am not aware.

. . . .

Q: Do you know whether the Advance radio control was involved in that litigation?

A: I do not.

. . . .

Q: How about in the De Seco suit, was the Advance radio control an issue in that lawsuit?

A: I don't know.

Q: Was [sic] tying arrangements an issue in that lawsuit?

A: I don't know.

Q: How about the Wonderlicht suit, was the Advance radio control an issue in that lawsuit?

A: I don't know.

Q: Was tying an issue in that lawsuit?

A: I don't know.

Q: Are you aware of whether or not this suit involved questions about operators and radios?

A: No, I am not aware.

Q: Any of the three [suits]?

A: I am not aware.

. . . .

Q: Three antitrust suits ended simultaneously, and my question is: Didn't you take an interest to find out what those lawsuits were about in being the corporate counsel?

A: I knew only in kind of general terms, that they involved disgruntled distributors who were attempting to assert claims under the antitrust laws against Overhead Door Corporation.

. . . .

Q: ... [A]s chief counsel of Overhead Door, you never investigated to find out what issues were involved in those three lawsuits?

A: No, I did not.

[Tr. 164–68.]

In his further testimony, Mr. Arnold offered no remotely satisfactory explanation for his sweeping ignorance of OHD's history of antitrust litigation. He acknowledged that he advised the corporation on issues pertaining to antitrust compliance, but when asked how he could offer such advice without knowing the subject matter of previous suits against OHD, he bluntly stated: "I wasn't particularly concerned about what had happened in the past." [Tr. 168.]

Mr. Arnold's alleged failure to inform himself about prior antitrust-related suits involving OHD is particularly revealing in light of the fact that one of his first assignments at OHD was to go through the corporation's files in the immediate aftermath of the three lawsuits, to determine which of the mass of accumulated documents should be discarded. Early in 1979, Mr. Arnold and Gary Barton, the head of OHD's credit department, whom Mr. Arnold described as OHD's litigation coordinator prior to Mr. Arnold's joining the corporation, together carried out the task of cleaning out both a "litigation file room" and a basement file room in OHD's Dallas headquarters. [Tr. 170–71.] Mr. Arnold described the litigation file room as "an interior office size room that was heaped full of old file storage boxes primarily containing distributor files." [Tr. 171.] These files had been retained on the belief that their contents "might be relevant in antitrust matters." [Tr. 173.] More specifically, the room "consisted primarily of boxes alphabetical in order of every distributor that Overhead Door had ever had or at least had records on." [Tr. 175.] The large majority of the distributor files, according to Mr. Arnold, pertained to terminated distributors. [Tr. 187.]

Mr. Arnold's testimony is inconsistent and ambiguous as to the exact relationship of the contents of the litigation file room to the so-called *Nordpal, DeCicco* and *Wunderlicht* cases. On the one hand, he acknowledged that the plaintiffs in both the

*Nordpal* and *DeCicco* cases were terminated distributors. [Tr. 179, 180.] He also described the file room as containing "isolated documents which—or files from which documents had been produced—in the *Nordpal* case, among others," and he indicated that the *Nordpal*-related files in that room had been discarded pursuant to the clean-up effort. [Arnold Dep. II, at 26; Tr. 208–09.] At the evidentiary hearing, however, he at first was evasive and eventually denied that the files in question bore any relationship to the *Nordpal* case:

Q: Are you now saying the[re] were no files in there from the Nordpal case?

A: There was not a single file which had any kind of label saying, "This file is relevant to the Nordpal case."

. . . .

Q: Are you saying there were no files in there that related to the Nordpal case?

A: That related to the Nordpal case?

Q: Yes.

A: I don't know what the word "related" means in that context.

. . . .

Q: Did the files in that room, to your knowledge, have something to do with the Nordpal case?

. . . .

A: I guess I will have to say no, they did not have anything to do with the Nordpal case.

[Tr. 174–75.]

Whatever the contents of the litigation file room, the stated goal of Messrs. Arnold's and Barton's efforts was to ensure that the files in that room were "substantially cleaned up and reduced to an orderly fashion." [Tr. 176–77.] Despite his assertedly minimal understanding of the substance of the *Nordpal, DeCicco* and *Wunderlicht* cases, Mr. Arnold has maintained that he had no real difficulty determining what documents in the litigation file room should and should not be preserved: "It was . . . fairly clear both to Mr. Barton and to myself as to what small subset of a file needed to be retained by Overhead Door Corporation and would be useful to Over-

head Door Corporation for their future purposes." [Arnold Dep. II, at 35.]

The clean-up of the litigation file room reportedly began in March 1979 and was completed by April 19, 1979, some four days before Telectron served its Complaint and Request for Production upon OHD, on April 23, 1979. [Tr. 183; Arnold Dep. II, at 26–27.] Mr. Arnold's efforts to rid the basement file room of unwanted documents reportedly commenced at the end of March or the beginning of April 1979, and continued beyond April 23, 1979. [Tr. 183.] The contents of this latter room were described by Mr. Arnold as ranging from ten-year old invoices, to old advertisements, to health insurance claims. [Tr. 178.] Mr. Arnold did not recall whether the basement files contained sales correspondence in general, or sales correspondence involving Advance radio controls, in particular. [Tr. 178.] In contrast to the materials in the litigation file room, the contents of the basement file room had reportedly not been examined in connection with the *Nordpal* or the *DeCicco* litigation. [Tr. 185.]

Other document destruction efforts were carried out or supervised by Mr. Arnold in the weeks preceding OHD's receipt of Telectron's Complaint and Request for Production. On April 3, 1979, Mr. Arnold visited an OHD plant in Hartford, Indiana, for the purpose of discarding documents retained by that facility during the course of the *Nordpal* and *DeCicco* litigation. This plant, it should be noted, was the principal supplier plant for the distributors involved in that litigation. [Tr. 228–30.] Mr. Barton reportedly supervised similar cleanup efforts at OHD plants in Pennsylvania and/or New York. [Tr. 228.]

### C. *Telectron's Complaint and Request for Production*

It is within the context of this ongoing document destruction effort that Mr. Arnold, representing OHD, was served with Telectron's Complaint and Request for Production in the above-captioned matter, on April 23, 1979. [Tr. 192–93.] What is particularly noteworthy about Telectron's

Complaint, in regard to Plaintiff's Motion for Default and for Sanctions, is the prominent position which *Advance* assumes throughout the text of the pleading. In the section of the Complaint describing the Parties to the action and the historical setting for Telectron's substantive allegations, OHD's acquisition of Advance is cast as an important turning point:

In or about November 1971 Defendant acquired all, or essentially all of the assets of Advance Industries, Inc. (hereinafter "Advance"), a competitor of Plaintiff in the manufacture and sale of radio controls, and made it one of Defendant's operating divisions. Through that acquisition Defendant entered the field of manufacturing and selling radio controls in interstate commerce and became a dominant economic factor in the market for radio controls nationwide.

[Complaint, ¶ 18.]

Advance Industries also figures prominently in Count I of the Complaint, which charges OHD with "exclusive dealing," in violation of Section 3 of the Clayton Antitrust Act and Section 1 of the Sherman Antitrust Act. The starting point of the exclusive dealing allegedly engaged in by OHD is clearly identified as the date of OHD's purchase of Advance:

After Defendant's acquisition of Advance in approximately November 1971, and continuing to the present, Defendant has pursued a uniform policy, through the contractual provisions of the Distributor Agreement [allegedly signed by all OHD distributors], coercion and pressure, of requiring its Distributors to purchase all radio controls manufactured or supplied by Defendant only from Defendant.

[*Id.*, ¶ 22.] Telectron maintains that it suffered damage to its business or property as a result of this exclusive dealing, in an amount in excess of $2.5 million. [*Id.*, ¶ 27.]

Although Advance is not mentioned by name in Counts II or III of the Complaint, these Counts incorporate by reference all previous paragraphs of the Complaint, and the allegations contained within Counts II and III clearly find their origins in OHD's acquisition of Advance. In Count II, Plaintiff maintains that it was foreclosed from selling radio controls to OHD's distributors because OHD established illegal tying arrangements with its distributors, requiring them "to purchase all of their requirements for overhead doors, door operators, radio controls and other products manufactured or sold by Defendant, exclusively from Defendant, as a condition of its permitting them to continue as Defendant's Distributors...." [*Id.*, ¶ 30.] Count III relies upon the same factual allegations in charging OHD with attempting to monopolize the sales to OHD distributors of door operators, radio controls and other related products. [*Id.*, ¶¶ 37–40.]

Several explicit references to Advance appear in Count IV of the Complaint, which seeks recovery on account of OHD's allegedly malicious and tortious interference with an established advantageous business relationship between Telectron and OHD's distributors. First, Plaintiff is alleged to have had an established advantageous business relationship with OHD's distributors "[p]rior to the acquisition of Advance by Defendant." [*Id.*, ¶ 42.] Second, OHD's allegedly uniform policy of tortious interference with Telectron's business relationships with these distributors is said to have begun "[a]fter Defendant acquired Advance." [*Id.*, ¶ 44.] And finally, it is alleged that OHD's distributors would have continued to purchase radio controls from Telectron "if Defendant had not ... required them to stop purchasing from Plaintiff and to purchase radio controls exclusively from the Advance division." [*Id.*, ¶ 45.]

In addition to the numerous references to Advance in Telectron's Complaint, it is also significant that the Complaint explicitly draws a connection between the above-captioned matter and OHD's prior litigation of the *Nordpal* suit. In a section of the Complaint refuting an anticipated statute of limitations defense by OHD, Plaintiff maintains that it was, for an unspecified

time, prevented from learning about OHD's alleged wrongdoing because OHD had fraudulently concealed from Plaintiff material facts giving rise to the causes of action set forth in the Complaint. [*Id.*, ¶ 50.] Telectron acknowledges that it learned facts relating to OHD's allegedly tortious conduct "when judgment was rendered against Defendant for antitrust violations involving some of the conduct complained of herein in the case of *Overhead Door Corporation v. Nordpal, Inc.*, D. Minnesota, Case No. 4–75 Civ 523 (October 13, 1978.)" [*Id.*, ¶ 52.] Telectron alleges, however, that it was unable to learn more facts as to the extent of OHD's tortious conduct because OHD reached a settlement, believed to be in excess of $1 million, through which the parties agreed to seal the court file and to refrain from discussing or disclosing information about the case to anyone. [*Id.*, ¶ 53.]

In its Request for Production, Telectron made numerous requests for documents associated with the Nordpal litigation. [Request for Production (Plaintiff's Ex. 16), ¶¶ 89, 90, 92–95.] In addition, and most directly relevant to our inquiry into the document destruction at Advance ordered by Mr. Arnold, the Request for Production made repeated reference to documents specifically related to the sale of Advance radio controls. Telectron, for example, sought production of a letter from John Lieber of OHD to Bob Nelson of Advance, dated May 1, 1972, regarding problems with Advance equipment. [*Id.*, ¶ 58.] Similarly, the following documents were requested: an inter-office memo from Bob Nelson to John Lieber, discussing a tuning problem with Advance radio controls [*id.*, ¶ 65]; a 1971 letter from Dale Ruckle at OHD to Robert Hagman, who was OHD's Sales Manager at the time, regarding the packaging of Advance radio controls with door operators [*id.*, ¶ 86]; and a report from OHD's Western Regional sales manager to Bob Hagman, concerning a trip whose partial purpose was "to call on dealers and review the transition to Advance controls" [*id.*, ¶ 87].

More general references to documents pertaining directly or indirectly to the marketing of Advance radio controls also appeared in the Request for Production. In paragraph 96, Telectron asked for "[a]ll documents relating to Overhead Door Corporation's policy or practice of 'total product representation' by its distributors." [*Id.*, ¶ 96.] Another request, focusing more specifically on Advance's area of business, asked for "[a]ll documents relating to any policy or practice of Overhead Door Corporation that its distributors purchase a radio control unit with each door operator purchased." [*Id.*, ¶ 98.] In yet another paragraph, Telectron referred to Advance by name, seeking "[a]ll documents relating to any policy or practice of Overhead Door Corporation that its distributors purchase radio controls from Overhead Door Corporation or the Advance division of Overhead Door Corporation." [*Id.*, ¶ 97.] Also likely to be found at Advance's plant were copies of monthly sales reports and market analyses, as well as "documents, brochures, sales offerings, service bulletins, letters to distributors, or any materials used in the sale of radio controls or door operators to distributors of Overhead Door Corporation"—all of which were solicited by the Request for Production. [*Id.*, ¶¶ 101–03.]

### D. *The April 23 Order to Destroy Documents at Advance*

As we have mentioned already, Mr. Arnold ordered the destruction of sales-related correspondence over two years old at the Advance Industries plant in Appleton, Wisconsin, on the very date that he was served with a copy of Telectron's Complaint and Request for Production. It is clear, from the numerous references to Advance in both the Complaint and the Request for Production, cited above, that even a cursory perusal of these documents would have enlightened Mr. Arnold that Advance figured prominently in Telectron's claims against OHD. It is also clear from Mr. Arnold's own testimony that he had learned, prior to the filing of this action, that Telectron had at one time had a license agreement with OHD, pursuant to which

Telectron had manufactured under the OHD trademark radio controls for sale to OHD distributors. [Tr. 187; Arnold Dep. II, at 39.] He was also aware that, by the time he had joined the OHD workforce in December 1978, OHD distributors were primarily using radio controls manufactured by OHD's Advance division. [Tr. 189.] In fact, on several occasions prior to April 23, 1979, he had spoken by telephone with Mr. Harold Stevens, Advance's General Manager. [Tr. 189, 387; Arnold Dep. II, at 71–73.]

In his hearing testimony, Mr. Arnold initially expressed uncertainty as to whether his receipt of Telectron's Complaint and Request for Production occurred on April 23, 1979, but he did not deny having received them on that date, after being shown a transmittal form, which was signed by him and was dated April 23, 1979. [Tr. 192; Arnold Dep. II, at 57.] Moreover, Mr. Arnold's testimony, taken as a whole, indicates clearly that he read both of the documents on the day he received them. [Tr. 193–201; Arnold Dep. II, at 58–59.] When asked at the evidentiary hearing, for example, if he recalled reading through the two documents at the time that they were served upon him, Mr. Arnold responded: "I did, indeed." [Tr. 193.] In earlier deposition testimony, he stated that he had read through the Complaint and Request for Production "[t]he same day" that he received them. [Arnold Dep. II, at 58.]

It is worth noting that, at one point in his testimony at the evidentiary hearing, Mr. Arnold expressed doubt as to whether he had, in fact, read the Request for Production on the date that it was served. [Tr. 197.] Any real doubts as to this matter were resolved, however, by Mr. Arnold's subsequent acknowledgment that information contained in the Complaint and the Request for Production caused him immediately to suspect that Telectron had somehow obtained substantial knowledge of the *Nordpal* suit, despite the settlement agreement which had allegedly sealed the file in that case:

Q: My question is whether you read over the request for production.

. . . .

A: [T]he reason that I believe that I read through the request for production is that shortly after the lawsuit was served, I was very suspicious or believed strongly that the Complaint and, perhaps, the request for production was put together based on the Nordpal case.

Q: Didn't you say the same day you received the Complaint and request for production that you wondered how the attorneys knew about the documents in the Nordpal case and had described them in the request?

A: That's what I recall; that either by reading the Complaint or the request for production in some fashion, it raised a question of how the drafters of these instruments were able to specify with such specificity.

Q: That was the same day you received it; was it not?

A: I believe it was.

Q: Doesn't that indicate to you you must have read the request for production and all that was in it?

A: Well, again, I believe that I looked at it. Perhaps I scanned it. I don't have a strong recollection.

[Tr. 199–200.]

While we may not be able to determine exactly how carefully Mr. Arnold read the Complaint and Request for Production on April 23, 1979, it is clear from the above-quoted testimony that he paid sufficiently close attention to the documents' contents to discern Telectron's knowledge of the *Nordpal* suit and of several key documents pertaining to that litigation. He also familiarized himself sufficiently with the Complaint, and found its contents sufficiently noteworthy, that he took it upon himself to discuss the Complaint that same day with two of OHD's senior vice-presidents, Robert Hagman and Jim O'Neil. [Tr. 201.] According to Mr. Arnold, it was observed during this discussion that OHD's President, Robert Haugh, was going to be "very

surprised" to learn of Telectron's knowledge about the *Nordpal* litigation. [*Id.*]

In addition to meeting with Messrs. Hagman and O'Neil to discuss the Telectron Complaint, Mr. Arnold made a fateful phone call on the same date to Harold Stevens, General Manager of the Advance division. [Tr. 390.] This phone conversation revealed both the seriousness with which Mr. Arnold regarded Telectron's claims against OHD and the extraordinary extent of his willingness to defy the rules of discovery in seeking to place potentially damaging documentation beyond Telectron's reach. In a memorandum addressed to sales-related personnel at the Advance division the very same day (April 23, 1979), Mr. Stevens relayed the orders which he had received over the phone from Mr. Arnold. The memorandum, identifying "Sales Correspondence" as its subject, stated in full:

> We have been directed by our legal counsel, Richard Arnold, to destroy today, April 23, 1979, all of *our generated* sales correspondence which is over two years old. Also we are to get rid of all our old files today. If there is a question about what is to be kept, Richard will provide the answer.
>
> This just means if you have a letter or memo which deals with pricing in your files which we wrote to a prospect or customer and it's over two years old, get rid of it.

[Plaintiff's Ex. 4 (emphasis in original).]

Mr. Stevens unequivocally testified that the above-quoted memorandum emanated directly from his phone conversation with Mr. Arnold on April 23, 1979. [Tr. 390–94.] When asked whether the memorandum accurately reflected the orders given to him by Mr. Arnold during the phone call, he responded: "I tried to make it that way." [Tr. 390.] Mr. Stevens reported that he had even taken notes during the course of the phone conversation, and had immediately thereafter drafted the memorandum relying upon those notes. [Tr. 391–92.] The conversation was reportedly brief—only a minute or two—but it dealt solely with the issues addressed in the memorandum. [Tr. 392.]

In describing the specific contents of his memorandum, Mr. Stevens consistently cast himself as merely a messenger for OHD's corporate counsel. He made it clear that Mr. Arnold had specified that the document destruction was to be carried out that same day. [Tr. 393.] When asked whether the instruction to destroy documents which were over two years old was Mr. Arnold's idea, he responded: "It wasn't mine." [Tr. 397.] The focus upon sales correspondence, moreover, was clearly identified as Mr. Arnold's idea. [Tr. 393, 397.]

Not only did Mr. Stevens, in his hearing testimony, point clearly and unequivocally to Mr. Arnold as the source of the document destruction orders in the memorandum, he also made an obvious effort, within the body of the memorandum itself, to identify Mr. Arnold as the responsible party. As the above-quoted text reveals, Mr. Stevens' memorandum opened with the declaration that Mr. Arnold had ordered the document destruction, and, in the very next sentence, the memorandum's recipients were advised that, if they had any questions about what should be kept, "Richard [Arnold] will provide the answer." [Plaintiff's Ex. 4.] Acknowledging that Mr. Arnold had not instructed him to include Mr. Arnold's name in the memorandum as the person to whom questions about document retention should be addressed, Mr. Stevens explained: "... I couldn't answer the questions, so that's the reason I put [Mr. Arnold's name] in there." [Tr. 394.]

Mr. Arnold, while claiming incredibly to have "no recollection" of a phone conversation with Mr. Stevens on April 23, 1979, has nevertheless stated that he could not dispute "Mr. Stevens' version" of that exchange. [Arnold Dep. II, at 74, 76.] He has further commented that the subject matter of the memorandum was "certainly not" something about which Mr. Stevens would have had any reason to lie. [Tr. 75.] Moreover, he has admitted that the document destruction order communicated by

the April 23 memorandum was of such significance that he would not likely have forgotten having issued it. [Arnold Dep. II, at 82.] The following exchange is revealing as to Mr. Arnold's professed befuddlement on this issue:

Q: As an attorney, did it occur to you ... that this would be an extraordinary act for an attorney to call a corporate employee and to tell him to destroy documents the very day a request for production was served on him?

A: That's what makes it all the more mystifying to me, because if I had this call with Mr. Stevens, it probably should have registered as more significant with me. Clearly, my lack of recollection indicates to me that whatever communication I had with Mr. Stevens, I didn't consider it significant, and obviously, the memo here suggests that something significant occurred. So, that's a contradiction which I'm hard pressed to reconcile.

[*Id.*]

In considering the above-cited testimony of Messrs. Stevens and Arnold, we find Mr. Arnold's professed lack of recollection as to his role in ordering the document destruction at Advance to be wholly implausible. We find no reason to doubt the veracity of Mr. Stevens' account of his telephone conversation with Mr. Arnold on the date in question, which, as we have already noted, Mr. Arnold himself has refrained from challenging. Moreover, we agree with Mr. Arnold that such an exchange would not have been easily forgotten, given its obvious, momentous implications. The most benevolent interpretation which might therefore attach to Mr. Arnold's testimony is that he is an unusually forgetful individual. We unequivocally reject this possible interpretation, however, as Mr. Arnold has offered no testimony to advance such a theory, nor has Defendant come forward with any independent evidence showing Mr. Arnold—a young, practicing attorney with rather impressive academic credentials [4]—to suffer from any such mental impairment. To the contrary, we believe and find explicitly that Mr. Arnold willfully and intentionally ordered this documentation destruction, that he did so fully aware of the decided impact upon the Telectron litigation, that he did so specifically in order to obscure OHD's history of anticompetitive endeavor, and that he sought to conceal this flagrant and contumacious conduct by testifying falsely before this Court as to his professed lack of recollection.

An additional reason for rejecting Mr. Arnold's testimony as to his asserted inability to recall the April 23 phone conversation arises from the deposition testimony of OHD's President, Robert Haugh. According to his testimony, Mr. Haugh first learned of the Stevens memorandum sometime in March 1981 in a phone conversation with Mr. Paul Trigg, chairman of OHD's executive committee and outside legal counsel to the corporation, while he was on an out-of-town trip. [Haugh Dep. at 20; Arnold Dep. II, at 9–10.] Upon his return to the office, Mr. Haugh has testified that he "severely reprimanded" Mr. Arnold:

I faced up to Mr. Arnold and we had a serious discussion. He was severely reprimanded for this, if he had in fact done this.... Mr. Arnold's answer to me was that he could not recall making such a phone call; *he could have, but he did not recall it.* It hung in the balance, and I subsequently advised Mr. Arnold he was in a very tenuous position because of this—if he, in effect, had done this—and that he was, in essence, on a probationary status as far as the company was concerned, and that I was going to continue to investigate it, and look into it, and if it ever came foolproof where I was convinced that he had done this, he'd be terminated.

[Haugh Dep. at 21–22.]

Further describing his interchange with Mr. Arnold, Mr. Haugh declared: "I raised

---

**4.** It should be noted in this regard that, prior to obtaining his law degree from the University of Texas, Mr. Arnold received a bachelor's degree in physics from Harvard College and a master's degree in physics from the University of California, San Diego. [Arnold Dep. II, at 11.]

hell with him, totally. I don't think many people would have gone through what he went through." [*Id.* at 22.] Mr. Haugh further reported that OHD was conducting "a continuing investigation of Mr. Arnold's performance as it pertains to this and ... other matters." [*Id.* at 23.] We note, in passing, that Mr. Arnold was removed from his position as corporate secretary a few months after being reprimanded by Mr. Haugh, and was terminated by OHD in April 1983, for reasons not revealed by the record. [Tr. 159, 290.]

Whether or not OHD's decision to fire Mr. Arnold emanated in whole or in part from a more conclusive determination that he had, in fact, ordered the destruction of records at Advance on the date in question, it is clear from Mr. Haugh's testimony that OHD's chief executive officer looked upon the document destruction order with utmost disapproval and regarded it as sufficiently violative of acceptable corporate practice to warrant placing its suspected instigator on probation. We applaud Mr. Haugh's candid reportage of his confrontation with Mr. Arnold, but unfortunately, no amount of such *ex post facto* disapproval can place within Plaintiff's reach the uncertain number of documents discarded by officials at the Advance division plant pursuant to the April 23, 1979 order.

### E. *Document Destruction at Advance*

As the text of the Stevens memorandum indicates, four Advance personnel were designated by Mr. Stevens to receive a copy of the destruction order: Mayford Geske, Advance's Sales Manager; Paul Buntin, a sales engineer for Advance; Arcelia Crupi, the purchasing and office manager; and Hubert Nelson, the division's accountant. [Plaintiff's Ex. 4; Tr. 388.] From the deposition and hearing testimony of these individuals, it is clear that a considerable—though indeterminate—number of documents were discarded in immediate response to the memorandum, and that additional document destruction occurred in subsequent months.

Mr. Stevens, who testified that he personally had destroyed documents from his own files on April 23, was unable to say with certainty what or how many documents had been destroyed. [Stevens Dep. at 8–10.] He did recall looking through two files, one marked "Competitor Companies" and the other titled "Pricing." Out of the "Pricing" file, which he described as containing materials pertaining to "special pricing to certain kinds of customers," Mr. Stevens recalled having removed a comparative price table, which compared the prices set by "all" operator and radio control manufacturers. [*Id.* at 9, 11.] While he did not specifically remember discarding any other documents from this file, he stated that he could not be certain that nothing else had been removed. All that he could say for certain was that he "really didn't get rid of much." [*Id.* at 9–10.] In searching through the "Competitor Companies" file, he threw away an unspecified number of sales-related documents. In total, he reported having thrown away documents which, if stacked, would have produced a pile one-quarter-of-an-inch thick. [Tr. 409.]

Mayford Geske, immediately upon receiving the Stevens memorandum, searched through two file folders in his desk titled "correspondence" and "price quotes." From these he remembered extracting ten to twelve letters, which he then discarded. [Tr. 65.] He acknowledged having found the destruction order to be "somewhat unusual," and recalled having questioned Mr. Stevens about it. When Stevens reassured him that the order reflected "company policy," Mr. Geske apparently inquired no further. [Tr. 69; Geske Dep. at 21.]

A dozen to two dozen pieces of paper were reported to have been discarded upon receipt of the Stevens memorandum by Paul Buntin, Advance's sales engineer. [Tr. 101.] The discarded documents, he recalled, included old sales literature and other pricing-related documents. [Tr. 106–107.] Although he didn't recall destroying any correspondence with OHD distributors, he admitted that he did not specifically recall *not* destroying any sales correspondence. [Tr. 109.]

Neither Arcelia Crupi nor Hubert Nelson, the purchasing and office manager and the accountant, respectively, recalled having discarded any documents on April 23, 1979, or immediately thereafter. [Tr. 302–03, 355.] Both, however, noted that they had received the Stevens' memorandum [Tr. 302, 345–46], and that subsequent to receiving it, they periodically discarded various documents to make room in their files. [Tr. 304, 356.] Ms. Crupi reported that she periodically weeded out purchasing-related correspondence with vendors as well as vendor brochures and price quotations once they became, in her view, obsolete. [Tr. 306.] Mr. Nelson recalled having periodically discarded accounting materials when the "retention period" had expired and he needed more space in his files. [Tr. 355–56.]

Crupi and Nelson were not alone among Advance personnel in periodically purging their files of materials which they regarded as obsolete, long after the Telectron Complaint and Request for Production had been filed and without having been informed as to the nature of the suit or the scope of documents sought to be produced. Mr. Stevens himself has acknowledged that he—the top executive at the OHD division most directly implicated by the suit—did not even learn that the suit had been filed until "about a year" after he circulated the memorandum calling for document destruction. [Tr. 411.] The suit was, in his words, "a pretty closely guarded secret." [*Id.*] Stevens further admitted that he continued to discard documents in his personal files until September 18, 1980, some seventeen months after receiving the directive to destroy, when he at last received a memorandum from Richard Arnold establishing a new policy of indefinite document retention. [Tr. 430–35; Defendant's Ex. 1.]

When he received the September 18 memorandum, Mr. Stevens circulated it to only three Advance employees: Arcelia Crupi, Hubert Nelson, and an individual named Mark Galozzi. [Tr. 430–31.] As Maynard Geske had been terminated by Advance in May 1979, it is clear why he was not provided with a copy of this memo.

[Tr. 74.] It is not at all apparent, however, why the fourth recipient of the earlier document destruction order, Paul Buntin, was not sent a copy of the memorandum. Mr. Buntin attested to the fact that he *never* received instructions to cease destroying documents, and that he continued to throw away files, including sales-related correspondence, on a periodic basis after April 23, 1979. [Tr. 149.]

An inevitable and, we must assume, a desired byproduct of OHD's internal secrecy about the suit was a pervasive state of ignorance, among employees at Advance as well as at other OHD facilities, about the sorts of documents which fell within the scope of Telectron's discovery requests. The predictable result of this ignorance was the loss forever of records whose value to Telectron can never be determined with any certainty.

### F. *Document Destruction at Other OHD Facilities*

The absence of a coherent document retention policy during the pendency of this lawsuit has extended beyond the Advance division, with possibly damaging document destruction occurring in both routine and non-routine manners at other OHD plants as well as at OHD's corporate headquarters in Dallas. On May 7, 1979, only two weeks after being served with Telectron's Complaint and Request for Production, Mr. Arnold sent a memorandum to seven OHD personnel, asking them to assist in a continuing effort to reduce the quantity of materials being kept in the basement storage room at OHD headquarters. [Tr. 256–59; Plaintiff's Ex. 20.] Specifically, these individuals were asked to "pull any possible obsolete files from the shelves and review them" leaving "[a]ny material to be discarded in the middle of the floor." [Plaintiff's Ex. 20.] Mr. Arnold maintained that, before these materials were actually carted away, he periodically combed through them, "to make sure there was nothing responsive to the request for production or even further that

there was nothing that appeared to be relevant to the lawsuit." [Tr. 258.]

In addition to his direct involvement in document destruction in the basement storage room, Mr. Arnold was aware that OHD employees at the Dallas facility continued to follow the pre-established procedure of reviewing the Dallas corporate files at year-end, pulling out material which they believed could be discarded under OHD's Standard Operating Procedure.[5] [Tr. 265.] In this regard, Mr. Arnold stated: "I am sure a substantial amount of material was discarded year end. That was the procedure." [Id.] He further admitted that no one familiar with Telectron's production requests screened these documents prior to their disposal. [Tr. 269.] As a result, according to Mr. Arnold's own admission, it is now impossible to determine whether the discarded documents might have fallen within the ambit of Telectron's Request for Production. [Id.][6]

Mr. Arnold did address the Telectron litigation in two memoranda sent to OHD personnel in 1979 and 1980. [Tr. 283–85; Defendant's Ex. 1 & 1A.] The first such memorandum, dated December 27, 1979, was directed to all employees at OHD's Dallas headquarters. It stated in full:

> As you are closing out your files and desks in preparation for the move to our new corporate office, you should be aware that we are involved in a substantial lawsuit with Telectron, Inc. If you encounter any papers which you suspect may have a bearing on this case, please check with me prior to their disposal. [Defendant's Ex. 1.]

The failings of this communique are obvious and numerous. First, it was issued more than eight months after Telectron's Complaint and Request for Production had been served and after Mr. Arnold had specifically ordered the destruction of documents related to this litigation. Second, as discussed above, substantial destruction of documents possibly pertinent to this action had already occurred by that point, both at OHD headquarters, at the Advance division plant, and at other OHD facilities. Third, rather than calling for the *retention* of all documents during the pendency of the suit, the memorandum merely suggested that documents appearing to have some relationship to the litigation be brought to Mr. Arnold's attention before being discarded. Given the memo's failure to describe, even in the briefest terms, the nature of Telectron's claims or the scope of its production requests, it is difficult to imagine how an OHD employee, after reading this memorandum, would have been able to conduct an intelligent screening of documents before disposing of them. Finally, even if the memorandum *had* included details sufficient to enable employees to screen documents effectively, the memo was addressed only to "corporate office employees"—i.e., those in OHD's Dallas

---

**5.** Whether the personnel carrying out this year-end document destruction actually knew the guidelines regarding document retention set forth in OHD's Standard Operating Procedure is a matter of considerable doubt. As we shall discuss shortly, neither OHD's President, Robert Haugh, nor the corporation's Senior Vice-President in charge of manufacturing and sales, Robert Hagman, could describe even the basic outlines of the corporation's Standard Operating Procedure in this area. [Haugh Dep. at 7–9; Hagman Dep. at 15.] Moreover, Mr. Arnold himself testified that the Standard Operating Procedure with regard to document retention "is more honored in the breach than in the observance." [Tr. 270; Arnold Dep. I, at 83.]

**6.** Mr. Arnold's admission that documents were destroyed without being reviewed as to their possible relevance to Telectron's Request for Production was offered at the evidentiary hearing held before this Court on March 12–13, 1986. This admission notably contradicted Mr. Arnold's earlier deposition testimony, in which he responded affirmatively to the question: "Were all of the documents within the custody, control or possession of Overhead Door Corporation reviewed pursuant to Telectron's request for production of documents?" [Tr. 265–69; Arnold Dep. I, at 43.] Subsequent to giving this earlier testimony, Mr. Arnold wrote a letter to the official reporter of the deposition, Mrs. Carol Bates, asking her to strike his affirmative answer, "yes," from the transcript. [Tr. 267; Plaintiff's Ex. 26 (Letter dated January 15, 1981).] When asked at the evidentiary hearing why he had requested that the reporter strike this response, Mr. Arnold offered no explanation. [Tr. 267–69.]

headquarters. [Defendant's Ex. 1.] Mr. Arnold has acknowledged that the memo was not sent to employees at any other facilities. [Tr. 293.]

It was not until September 18, 1980, nearly seventeen months after the Complaint was served, that a memorandum finally went out, calling generally for the retention of documents during the pendency of the suit. [Defendant's Ex. 1A.] This document, addressed to "All Managers of U.S. Door Plants—Advance, Shelbyville," was explicit in suspending the "normal records retention/destruction program" and in instructing that obsolete records be boxed and stored rather than destroyed. [*Id.*] Even this communication, however, apparently did not reach all OHD personnel. Robert Hagman, OHD's Senior Vice-President in charge of manufacturing from 1976 until 1981, testified in July 1981 that he had *never* received instructions not to destroy documents in light of the Telectron suit. [Hagman Dep. at 7–9, 19.] Disturbingly, Mr. Hagman further revealed that he had destroyed documents contained in his desk file as recently as December 1980.[7]

Not only did Mr. Hagman maintain that he had never been told to retain documents in his personal files during the pendency of the Telectron suit; he was also not even aware of whether OHD had a document retention policy at all. [*Id.* at 15.] Furthermore, even if he had been told not to discard documents which might be related to the Telectron litigation, he would have been ill-prepared to make such determinations as he had never read any of Telectron's requests for production. [*Id.* at 41–42.]

Deposition testimony of OHD's President, Robert Haugh, makes embarrassingly apparent the corporation's utter neglect in ensuring that documents relevant to this litigation would be retained. When asked whether he had instructed corporate employees and officers not to destroy documents since the initiation of the suit, Mr. Haugh responded that instructions of this nature had been issued orally at a staff meeting in the spring or summer of 1979. [Haugh Dep. at 26.] Even assuming, *arguendo*, that such instructions were actually given at a staff meeting in 1979, the ineffectuality of this communication was highlighted by further questioning of Mr. Haugh:

Q: Who would be at a staff meeting? What kind of people?

A: Senior vice-presidents; Richard Arnold; probably vice-president of marketing.

Q: Would Bob Hagman be there?

A: Yes, he would have been there.

Q: Then, why would he not know that this directive had been given?

. . . .

A: He may not have been there. They weren't always at the meetings. He could have been out of town.

Q: Would there be minutes of such a meeting?

A: No. Most of those meetings were of a verbal nature.

Q: And you couldn't recall who was at that specific meeting and who was not?

A: No, I could not.

[*Id.* at 26–27.]

The failure of OHD's top management to provide any leadership or effective oversight regarding document retention is further evidenced by Mr. Haugh's acknowledged ignorance as to the corporation's ongoing document retention policy allegedly set forth in OHD's Standard Operating

---

7. On his desk, Mr. Hagman kept what he referred to as his "current file," a sheaf of files approximately twelve to fifteen inches thick. The fourteen to fifteen files in this collection contained correspondence pertaining to various of OHD's manufacturing operations. [Hagman Dep. at 17–18.] When he periodically visited a manufacturing plant, Mr. Hagman would bring along the file folder pertaining to that plant and, after discussing with the relevant personnel any issues raised by documents in the file, he would discard these documents. Additionally he reported that, at the end of each year, he personally would sift through his collection of files and "just throw out everything that wasn't current." [*Id.*] At his deposition testimony on July 21, 1981, he recalled having last carried out this sort of review at the end of 1980. [*Id.* at 18.]

Procedure manual. He believed that such a policy had been established in 1966 or 1967, but he knew none of the policy's provisions and stated that he did not know if anybody was formally charged with implementing the policy. [*Id.* at 7–8.] He guessed that OHD's financial department, legal counsel, and senior vice-presidents would be involved, but he emphasized: "I don't think it's really formalized." [*Id.* at 8–9.]

Within this context of indifference and professed ignorance among OHD's top management, Mr. Arnold, the corporation's chief legal officer, allowed and orchestrated the destruction of documents at OHD–Dallas and various of OHD's manufacturing plants over many months, free from the scrutiny of superior corporate officers. As we noted earlier, Mr. Haugh did reprimand Mr. Arnold for having apparently ordered the destruction of documents at Advance on April 23, 1979, but this reprimand can only be described at best as "too little, too late." By the spring of 1981, when this reprimand was issued, document destruction, both calculated and inadvertent, had been proceeding under Mr. Arnold's guidance for approximately two years. Moreover, Mr. Arnold retained his position as corporate legal counsel for more than two years *after* being reprimanded by Mr. Haugh.

## II. *Conclusions of Law*

From the facts recounted, it is clear that OHD, through its corporate secretary and legal counsel, ordered the destruction of records directly relevant to Telectron's Complaint and Request for Production. We have specifically found that Mr. Arnold's actions constituted a willful attempt to remove from circulation forever corporate records which might have substantiated many of Telectron's claims against OHD. Finally, the evidence has shown that substantial numbers of documents were destroyed pursuant to Mr. Arnold's directive, and that the unavailability of these documents has prejudiced Telectron's ability to prepare itself for a trial of its claims on the merits.

In light of these findings of unmistakably willful and prejudicial wrongdoing, our challenge has been to fashion a sanction which would restore Telectron's ability to prosecute its claims, punish OHD for the flagrant abuses of the judicial process perpetrated by its corporate secretary and legal counsel, and deter others from engaging in similar abuses in the future. The entry of default judgment as to OHD's liability under Counts I through IV of the Complaint, we have decided, is the only measure which will satisfy these three objectives. In imposing this sanction, we rely both upon the inherent powers vested in this Court as well as the authority bestowed upon the Court by Rule 37 of the Federal Rules of Civil Procedure.

### A. *Inherent Powers*

■ The federal district courts of this nation possess the inherent power to regulate litigation and to sanction litigants for abusive practices. *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 765, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980); *Van Bronkhorst v. Safeco Corp.,* 529 F.2d 943, 951 (9th Cir.1976); *Wm. T. Thompson Co. v. General Nutrition Corp.,* 593 F.Supp. 1443, 1455 (C.D.Calif.1984). This power is broader and more flexible than the authority to sanction found in the Federal Rules of Civil Procedure. *Van Bronkhorst v. Safeco Corp.,* 529 F.2d at 951. The Supreme Court has described the inherent powers of the federal courts as those which " 'are necessary to the exercise of all others.' " *Roadway Express v. Piper,* 447 U.S. at 764, 100 S.Ct. at 2463 (*quoting United States v. Hudson,* 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812)). Deeply rooted in the common law tradition is the power of any court to manage its affairs, "which necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it." *Carlucci v. Piper Aircraft Corp.,* 775 F.2d 1440, 1447 (11th Cir.1985).

■ The authority to dismiss an action for lack of prosecution or to enter default for discovery abuses is one of the inherent

powers of the court. *Roadway Express v. Piper*, 447 U.S. at 765, 100 S.Ct. at 2463; *Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F.Supp. at 1455–56. In particular, the courts have the inherent power to enter a default judgment as punishment for a defendant's destruction of documents:

> Sanctions may be imposed against a litigant who is on notice that documents and information in its possession are relevant to litigation, or potential litigation, or are reasonably calculated to lead to the discovery of admissible evidence, and destroys such documents and information. While a litigant is under no duty to keep or retain every document in its possession once a complaint is filed, it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request.

*Wm. T. Thompson v. General Nutrition*, 593 F.Supp. at 1455 (citations omitted). The court in *Thompson* found that a corporate defendant had "knowingly and purposefully" permitted its employees to destroy key documents and records, thereby depriving the plaintiff of access to objective evidence needed to build its case against the defendant. Acting upon its inherent powers as well as Rule 37, Fed.R. Civ.P., that Court imposed default judgment as a sanction. *Id.* at 1455–56.

■ In the case at bar, there is disturbingly similar evidence of willful document destruction by a corporate defendant, carried out in an unabashed—and successful— attempt to render irretrievable records clearly pertinent to the claims brought against it. As our recitation of the facts reveals, OHD's chief legal counsel and corporate secretary, Richard Arnold, has acknowledged that he was served with Telectron's Complaint and First Request for Production on April 23, 1979. [Tr. 192–93; Arnold Dep. II, at 58.] His testimony establishes that he read through these documents on the day he received them. [Tr.

193–201; Arnold Dep. II, at 58–59.] Given the manner in which these two papers were drafted, even a brief reading would have alerted Mr. Arnold to the central role which Advance Industries played in Telectron's claims against OHD. Indeed, the entire Complaint takes as its starting point the acquisition of Advance by OHD in November 1971. [Complaint, ¶ 18.] It is from this time forward that OHD is alleged to have induced its distributors to purchase only radio controls manufactured by Advance, in violation of the antitrust laws of the United States and in tortious interference with Telectron's established business relationship with these distributors. [Complaint, Counts I–IV.]

In addition to the numerous prominent references to Advance in the Complaint, Telectron's Request for Production unambiguously targeted documents related to and likely to be found at Advance. Moreover, essentially all of the documents requested from Advance fall quite clearly under the general rubric of "sales correspondence." [*See* Request for Production, ¶¶ 58, 65, 86, 87, 96–98, 101–103.] It was precisely this category of documentation at Advance which Mr. Arnold ordered immediately destroyed on the very date that the Complaint and Request for Production were served. In immediate response to this bold directive, at least three employees at Advance, including the plant's general manager, Harold Stevens, destroyed a substantial number of sales-related documents. In addition, periodic and unsupervised document destruction persisted both at the Advance plant and at other OHD facilities for many months following service of the Complaint and the Request for Production.

The contents of the correspondence and other records destroyed pursuant to Mr. Arnold's order can no longer be fairly determined, as secondary evidence of the contents of destroyed writings is prohibited where "the proponent lost or destroyed them in bad faith." Fed.R.Evid. 1004(1).

It is well settled, under the best evidence rule, that in proving the contents

of a document, the document itself must be produced unless it is shown to be unavailable through no fault of the proponent. If it is satisfactorily shown to be unavailable, secondary evidence as to its contents may be received.

*Bendix Corp. v. United States,* 600 F.2d 1364, 1371–72, 220 Ct.Cl. 507 (1979) (citations omitted) (where blueprint of contractor's drawings was unavailable through no fault of proponent, secondary evidence was deemed admissible as to its content). In the present case, we are faced with a defendant which seeks to establish, through secondary evidence, that the numerous documents destroyed at the Advance division facility in the immediate aftermath of Mr. Arnold's order were not pertinent to Telectron's claims and therefore did not prejudice Telectron's ability to litigate the case. [OHD's Memorandum of Law in Opposition to Telectron's Motion for Default and Sanctions, at 9–30.] We emphatically reject this line of argument, for two reasons. First, Plaintiff's right to a full and fair adjudication of its claims on the merits would be poorly protected if OHD, having purposefully, willfully, and in bad faith destroyed an indeterminate number of documents, were subsequently allowed to introduce extraneous evidence for the purpose of showing that no real prejudice had resulted from its bald defiance of Telectron's production request. Second, we have no reason to doubt that the documents admittedly destroyed—sales and pricing-related correspondence, literature, and records held by Advance's general manager and sales personnel—would have been highly relevant to Telectron's grievances, given the Complaint's central focus upon Advance's allegedly unlawful intrusion upon Telectron's business relations with OHD distributors.

In light of OHD's willful destruction of documents and the prejudice to Telectron caused by this activity, we find that the entry of default judgment as to OHD's liability is a measure falling appropriately within this Court's inherent authority to sanction litigants who consciously seek to undermine the very foundations of our discovery process.

### B. *Rule 37 Sanctions*

■ More specifically delineated than the Court's inherent authority to impose sanctions are the powers set forth in Rule 37 of the Federal Rules of Civil Procedure. The analysis under Rule 37, however, is essentially the same, and our conclusion is the same: the Defendant's willful disruption of the discovery process fully warrants our entry of default judgment on the question of liability.

Rule 37 authorizes a panoply of sanctions for a party's failure to comply with the rules of discovery. Subsection (d) provides that where a party fails to "serve a written response to a request for inspection submitted under Rule 34, after proper service of the request," the court may enter "such orders in regard to the failure as are just," including those actions authorized by Rule 37(b)(2)(A), (B) and (C), which provide the following remedies:

(A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence;

(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action of proceeding or any part thereof, or rendering a judgment by default against the disobedient party.[8]

---

8. Subsections (c) and (d) of Rule 37 are exceptions to the general principle that Rule 37 sanctions are to be imposed only upon violation of a court order. *Dorey v. Dorey,* 609 F.2d 1128, 1134–35 (5th Cir.1980). In the case at bar, the destruction occurred when the court's jurisdiction was first invoked; i.e., on the very day that the Complaint and Request for Production were served upon the Defendant. As Plaintiff's First Request for Production was served in compli-

At the outset, we observe that a court's discretion to impose sanctions under Rule 37—particularly the entry of default or dismissal of an action—is limited by important constitutional and policy considerations. Default judgment is " 'the most severe in the spectrum of sanctions provided by statute or rule.' " *Wilson v. Volkswagen*, 561 F.2d 494, 503 (4th Cir.1977) (footnote omitted), *cert. denied*, 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 768 (1978). It represents, in effect, an infringement upon a party's right to trial by jury under the Seventh Amendment; it runs counter to a sound public policy of deciding cases on their merits; and finally it works against the goal of providing each party its fair day in court. *Id.* at 503–04; *see also Societe Internationale v. Rogers*, 357 U.S. 197, 209, 78 S.Ct. 1087, 1094, 2 L.Ed.2d 1255 (1958). The Fourth Circuit has described the necessary balance in these terms:

> Because of the importance of these constitutional and policy considerations, ... the exercise of the power should be confined to the "flagrant case" in which it is demonstrated that the failure to produce "materially affect[s] the substantial rights of the adverse party" and is "prejudicial to the presentation of his case." This is so because a default judgment should normally not be imposed "to foreclose the merits of controversies as punishment for general misbehavior" save in that rare case where the conduct represents such "flagrant bad faith" and "callous disregard" of the party's obligations under the Rules as to warrant the sanction not simply for the purpose of preventing prejudice to the discovering party but as a necessary deterrent to others.

*Wilson v. Volkswagen*, 561 F.2d at 504 (footnotes omitted).

 The imposition of a default judgment as a Rule 37 sanction is controlled by the same guidelines as the entry of a dismissal order. *Carlucci v. Piper Aircraft Corp.*, 102 F.R.D. 472, 488 (S.D.Fla.1984), *aff'd in part, rev'd in part*, 775 F.2d 1440 (11th Cir.1985). Both are extreme remedies which should only be imposed if less drastic sanctions cannot properly redress the wrongdoing. *See Hashemi v. Campaigner Publications, Inc.*, 737 F.2d 1538 (11th Cir.1984); *Aztec Steel Co. v. Florida Steel Corp.*, 691 F.2d 480, 481–82 (11th Cir.1982); *Bryant v. City of Marianna, Florida*, 532 F.Supp. 133, 137 (N.D.Fla. 1982). In short, a court has "broad, although not unbridled, discretion in imposing sanctions, including default judgment and dismissal, under Rule 37." *Dorey v. Dorey*, 609 F.2d 1128, 1135 (5th Cir.1980) (citations omitted)[9]; *accord, Wilson v. Volkswagen of America, Inc.*, 561 F.2d at 503; *see Joselson v. Lockhart-Bright Associates*, 95 F.R.D. 160, 163 (E.D.Pa.1982); *National Lawyers Guild v. Attorney General*, 94 F.R.D. 600, 615 (S.D.N.Y.1982); *Perry v. Golub*, 74 F.R.D. 360, 364 (N.D. Alabama 1976).

Like this Court's inherent powers, Rule 37 is designed to protect basic institutional values: "Rule 37 sanctions are imposed not only to prevent unfair prejudice to the litigants but also to insure the integrity of the discovery process." *Aztec Steel Co. v. Florida Steel Corp.*, 691 F.2d at 482. In a decision upholding a district court's dismissal of an action because of sustained and repeated discovery violations, the Supreme Court has held that resort to this ultimate

---

ance with the Federal Rules of Civil Procedure, Defendant was bound to respond to that request as provided by Rule 34. There was no cause, nor time, for the court to intervene in the immediate aftermath of the service of these papers. Accordingly, the absence of a court order eliminates Rule 37(a) from our consideration of sanctions, and Rule 37(b) only applies insofar as sanctions provided thereunder can be invoked through the application of Rule 37(d). *See, e.g., Fox v. Studebaker-Worthington, Inc.*, 516 F.2d 989 (8th Cir.1975) (dismissal of complaint up-

held as a sanction under Rule 37(d), where plaintiff at first maintained that he had destroyed recorded tapes of "bugged" conversations and later asserted that no wiretapping or taperecording had ever occurred).

9. In *Bonner v. City of Prichard, Ala.*, the Eleventh Circuit adopted as binding precedent those decisions rendered by the Former Fifth Circuit prior to October 1, 1981. 661 F.2d 1206 (11th Cir.1981).

sanction under Rule 37 serves two important goals: to penalize and to deter conduct which is in flagrant disregard of the rules of discovery. The Supreme Court observed:

> [H]ere, as in other areas of the law, the most severe in the spectrum of sanctions provided by statute or rule must be available to the District Court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.

*National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976). The Supreme Court in that case reversed an appellate decision invalidating a district court's dismissal order which had been entered as a Rule 37 sanction against a party found to have repeatedly failed to answer crucial interrogatories.

Shortly after the Supreme Court had rendered its decision in *National Hockey League*, the former Fifth Circuit cited it as authority in upholding the dismissal of a counterclaim pursuant to Rule 37(b)(2), in a case where the defendant was found to have acted in "flagrant disregard" of a district court's discovery orders. *Emerick v. Fenick Industries, Inc.*, 539 F.2d 1379, 1381 (5th Cir.1976). The lower court's dismissal order was upheld in *Emerick* because of its "deterrent aspect," despite the Circuit's acknowledgment that, "following imposition of a more lenient sanction, the chastened appellant might have complied with the district court's orders...." *Id.; see Carlucci v. Piper Aircraft Corp.*, 102 F.R.D. at 488–89 (default judgment imposed as punishment and deterrent where defendant engaged in willful destruction of documents); *Joselson v. Lockhart-Bright Associates*, 95 F.R.D. at 162–63 (defendants' total failure to provide discovery warranted the entry of default judgment, *inter alia*, to deter similar disregard for Court Orders in the future).

In numerous cases, dismissal or default judgment has been ordered as a Rule 37 sanction for discovery-related abuses less egregious than those engaged in by OHD. In *National Hockey League*, the Supreme Court upheld the dismissal of a private antitrust action where the plaintiff had repeatedly failed to provide satisfactory answers to interrogatories over a seventeen-month period, despite several extensions and admonitions by the District Court. 427 U.S. at 640–41, 96 S.Ct. at 2779–80. In *Aztec Steel*, the Eleventh Circuit affirmed an order of dismissal based upon plaintiff's filing of evasive and incomplete answers to interrogatories. 691 F.2d at 481; *see also Hashemi v. Campaigner Publications, Inc.*, 572 F.Supp. 331 (N.D.Ga.1983), *aff'd*, 737 F.2d 1538 (11th Cir.1984) (action dismissed where plaintiff willfully failed on two occasions to appear for his own deposition, and failed to provide complete answers to interrogatories); *Bryant v. City of Marianna, Florida*, 532 F.Supp. 133 (N.D.Fla.1982) (default judgment entered in favor of plaintiff following defendants' failure to respond to discovery requests, despite repeated court orders, and their failure to attend a hearing on motion for default judgment).

Both more serious—and certainly less remediable—than a party's failure to respond to discovery requests is the willful destruction of discoverable materials. In cases where such destruction has occurred, default judgment has been deemed the only appropriate sanction under Rule 37. In *Carlucci v. Piper Aircraft Corp.*, the district court entered default judgment against the defendant aircraft manufacturer following Piper's willful destruction of test flight records which were potentially detrimental to its interests in the case. Justifying this ruling, the court stated:

> The policy of resolving lawsuits on their merits must yield when a party has intentionally prevented the fair adjudication of the case. By deliberately destroying documents, the defendant has eliminated the plaintiffs' right to have their cases decided on the merits. Accordingly, the entry of a default is the only means of effectively sanctioning the defendant and remedying the wrong.

102 F.R.D. at 486; *see also Fox v. Studebaker-Worthington, Inc.*, 516 F.2d 989 (8th Cir.1975) (dismissal of complaint upheld where plaintiff at first testified that he had discarded recorded tapes of "bugged" conversations and later asserted that no wiretapping or tape recording had ever occurred); *Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F.Supp. 1443 (C.D. Calif.1984) (default judgment and monetary sanctions imposed where defendant willfully destroyed records both before and after the issuance of a court order mandating the preservation of such records).

Before the ultimate sanction of default judgment may be entered, this Court must make the following findings: (1) that Defendant acted willfully or in bad faith; (2) that Plaintiff was prejudiced by Defendant's conduct; and (3) that lesser sanctions would not serve the punishment-and-deterrence goals set forth in *National Hockey League* and its progeny. These prerequisites have been developed as a means of ensuring the proper balance between the need to engender good-faith adherence to the rules of discovery, on the one hand, and a commitment to protecting the parties' constitutional and policy interests in a full and fair adjudication of their claims, on the other. *See Wilson v. Volkswagen*, 561 F.2d at 503–04; *Roberson v. Christoferson*, 65 F.R.D. 615, 622 (D.N.D.1975); *Wembley, Inc. v. Diplomat Tie Co.*, 216 F.Supp. 565, 574 (D.Md.1963). We find that each of these three elements is present, and we are compelled to conclude that default judgment as to OHD's liability is the only sanction fully commensurate with the Defendant's wrongdoing.

### 1. *Willfulness*

Resort to "the most severe in the spectrum of sanctions"—dismissal of an action or the entry of default judgment—is clearly appropriate where the offending party is found to have exhibited " 'flagrant bad faith' " and its counsel has acted with " 'callous disregard' " for the rules of discovery. *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 643,

96 S.Ct. 2778, 2781, 49 L.Ed.2d 747. "When a party demonstrates a flagrant disregard for the court and the discovery process, ... dismissal is not an abuse of discretion." *Aztec Steel Co. v. Florida Steel Corp.*, 691 F.2d 480, 481 (11th Cir. 1982) (*citing Emerick v. Fenick Industries, Inc.*, 539 F.2d 1379 (5th Cir.1976)).

In the case at bar, we have no doubt as to the Defendant's willfulness in destroying documents pertinent to Telectron's Complaint and Request for Production. The evidence establishing Mr. Arnold's culpability in this regard, initially set forth in great detail in our Findings of Fact and later summarized in our discussion of the Court's inherent power to sanction discovery abuses, need not be recounted at length here. We only observe that the order given by Mr. Arnold on April 23, 1979 reflected a calculated effort by a key corporate officer specifically aimed at obstructing Telectron's discovery of relevant OHD records. The memorandum communicating this order to selected personnel at the Advance facility was authored by another important OHD officer, Harold Stevens. Finally, the evidence reveals that, once this original directive to destroy sales-related correspondence was given, no action was taken to deter Advance employees from continuing to destroy records of possible relevance to the litigation for nearly seventeen months following service of the Complaint and Request for Production. [Tr. 430–35; Defendant's Ex. 1.] During the intervening period, unsupervised document destruction persisted. [Tr. 149, 304, 355–56, 430–35.]

Mr. Arnold's willfulness is further reflected in his persistent efforts at dissemblance when confronted by questions regarding the April 23 order. In deposition testimony, he acknowledged that he would not likely have forgotten having issued such an important destruction directive but asserted "no recollection" of having done so. [Arnold Dep. II at 74–82.] In testimony before this Court, Mr. Arnold again professed a lack of recollection as to these critical events. [Tr. 221–24.] As stated earlier, we find Mr. Arnold's statements on

this issue entirely unconvincing, and therefore regard his stance on the matter as an additional indication of his willful obstruction of the discovery process.

The specifically mandated destruction of documents at Advance occurred within a broader context of document destruction at OHD's Dallas headquarters and at other OHD facilities, much of which was instigated and coordinated by Mr. Arnold. [See I(B) and (F), *supra.*] The record suggests but does not conclusively establish that these broader efforts were part of a campaign to rid OHD of records which might expose it to further antitrust liability following the *Nordpal, DeCicco,* and *Wunderlicht* litigation. At all events, it is clear that neither Mr. Arnold nor any other officer at OHD made any concerted attempt to curtail this ongoing disposal of records once the Telectron Complaint had been filed.

In light of Mr. Arnold's actions on April 23, 1979, his flagrant dishonesty as to these actions in subsequent discussion, and the absence of any genuine efforts to prevent further document destruction at Advance or other OHD facilities in the ensuing months, we find OHD's willfulness in abusing the discovery process more than sufficient to warrant the entry of default judgment.

### 2. *Prejudice*

When one party has willfully violated the rules of discovery, the entry of default or dismissal as a sanction has generally required a finding that the abuse has caused some prejudice to the party seeking discovery. The Fourth Circuit's cautionary soundings in this regard have already been cited but are worthy of reiteration: "[T]he exercise of the power [to impose default judgment] should be confined to the 'flagrant case' in which it is demonstrated that the failure to produce 'materially affect[s] the substantial rights of the adverse party' and is 'prejudicial to the presentation of his case.'" *Wilson v. Volkswagen,* 561 F.2d 494, 504 (4th Cir.1977), *cert. denied,* 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 768 (1978) (footnotes omitted). The Eleventh Circuit has followed a similar course, reversing the dismissal of a personal injury action where the plaintiff's failure to file a timely pretrial order was not shown to have "prejudiced [the defendant] in such a manner as to require dismissal with prejudice." *Ford v. Fogarty Van Lines, Inc.,* 780 F.2d 1582, 1583 (11th Cir.1986); *see also Wembley, Inc. v. Diplomat Tie Co.,* 216 F.Supp. 565, 574 (D.Md.1963) (defendant's motion to strike certain exhibits and testimony introduced by plaintiff at trial denied because, *inter alia,* "[n]o substantial right of the defendant" was found to have been affected by plaintiff's allegedly incomplete answers to interrogatories); *compare Roberson v. Christoferson,* 65 F.R.D. at 621–22 (D.N.D.1975) (dismissal under Rule 37 entered where plaintiffs' failure to respond properly to defendant's interrogatories was deemed "material" and "prejudicial" to their defense).

In ordering and carrying out the destruction of documents, the Defendant has attempted to place forever beyond the Plaintiff's reach a substantial portion of otherwise discoverable, relevant evidence. The irretrievable loss of these materials has decidedly prejudiced Telectron's ability to adjudicate its claims fully and fairly. This prejudice derives both from the irretrievable loss of materials relevant to Telectron's claims and from the delay, inconvenience and expense suffered by Telectron in investigating the sources and impact of OHD's document destruction scheme.

Turning first to the prejudice caused by the document destruction itself, we note that the Stevens memorandum, undisputably based upon Mr. Arnold's orders, explicitly called for the immediate destruction of "sales correspondence" at the Advance radio control division. [Tr. 390–94, Plaintiff's Ex. 4.] In light of the contents of Telectron's Complaint and First Request for Production, which Mr. Arnold had read on the very day that he issued the destruction order, there is no doubt that Mr. Arnold, in issuing the order, sought to place records at Advance which might be damaging to OHD's position forever beyond Te-

lectron's reach. It is clear that Telectron's Complaint, in asserting various antitrust-related claims against OHD, directly and primarily implicated OHD's policies and practices vis-a-vis the sale of Advance radio controls. [Complaint, Counts I–III.] Similar prominence was given to the sale of Advance equipment in Count IV, alleging that OHD had tortiously interfered with Telectron's previously established advantageous business relationships with OHD distributors. The Request for Production, moreover, was explicit in seeking materials related to the sale of Advance equipment to OHD distributors. [*See, e.g.,* Request for Production, ¶¶ 58, 65, 86, 87, 96–98, 101–103.]

Given the nature of Telectron's claims against OHD and the scope of production sought, we are at a loss to conceive of a category of documents more directly relevant to Telectron's grievances than "sales correspondence" and other sales-related materials contained in the files of Advance personnel. This evidence bears directly upon the relationship between OHD and its distributors and would have been directly pertinent to the Plaintiff's antitrust-related claims. It is precisely these sorts of documents and records which Mr. Arnold ordered immediately destroyed, and it is precisely these sorts of records which were, in fact, destroyed pursuant to Mr. Arnold's order. Mr. Stevens, Advance's General Manager, admitted that he had discarded sales-related documents, possibly including records pertaining to "special pricing to certain kinds of customers." [Stevens Dep. at 9, 11.] Mayford Geske, the division's sales manager, recalled having thrown away letters pertaining to the sale of Advance equipment. [Tr. 65.] Additional documents, possibly including correspondence with OHD distributors, were destroyed by Advance's sales engineer, Paul Buntin. [Tr. 101–09.]

From the descriptions of documents destroyed at Advance, offered by the very personnel who destroyed them, a strong inference can thus be drawn that some or all of the discarded materials were relevant to Telectron's Complaint and Request for Production. Moreover, while it is now impossible to determine precisely what or how many documents were destroyed, the bad-faith destruction of a relevant document, by itself, "gives rise to a strong inference that production of the document would have been unfavorable to the party responsible for its destruction." *Coates v. Johnson & Johnson,* 756 F.2d 524, 551 (7th Cir.1985) (citations omitted); *see also Nation-Wide Check Corp. v. Forest Hills Distributors,* 692 F.2d 214, 217 (1st Cir.1982); *National Association of Radiation Survivors v. Turnage,* 115 F.R.D. 543 (N.D. Calif.1987); *Wm. T. Thompson Co. v. General Nutrition Corp.,* 593 F.Supp. 1443, 1455 (C.D.Calif.1984).

The "adverse inference rule" has also been applied by the former Fifth Circuit in *Vick v. Texas Employment Commission,* 514 F.2d 734, 737 (5th Cir.1975). The Court in *Vick* upheld a trial court's finding for the defendant employment commission in a sex discrimination case, despite the fact that records relevant to the plaintiff's employment had been destroyed by the Commission's personnel prior to trial. In so ruling, the court explained that, in the absence of a finding that the employment commission had acted in bad faith, no adverse inference as to the probative value of the destroyed documents was called for:

> [The Commission's] records on [the plaintiff] were destroyed before trial, apparently pursuant to Commission regulations governing disposal of inactive records.... The adverse inference to be drawn from destruction of records is predicated on bad conduct of the defendant. "Moreover, the circumstances of the act must manifest bad faith. Mere negligence is not enough, for it does not sustain an inference of consciousness of a weak case." McCormick, Evidence § 273 at 660–61 (1972), 31A C.J.S. Evidence § 156(2) (1964). There was indication here that the records were destroyed under routine procedures without bad faith and well in advance of [plaintiff's] service of interrogatories. Certainly,

there were sufficient grounds for the trial court to so conclude. *Id.*[10]

The facts in the present case differ strikingly from those which led the Fifth Circuit in *Vick* to uphold the trial court's decision not to draw an adverse inference from the defendant's destruction of records. Here the Defendant's actions were unequivocally motivated by the flagrant bad faith of OHD's in-house counsel and corporate secretary, who explicitly and urgently called for the destruction of records in a category directly related to the opposing party's claims, on the very date that he became aware of those claims. This willful and premeditated scheme, thoroughly revealed through the testimony of several of the Defendant's employees, warrants the inference that the destroyed documents would have been harmful to OHD, had they been produced. The unavailability of these documents today must therefore be seen as prejudicial to Telectron's interest in pursuing the full and fair litigation of its claims.

■ We also note in passing that Telectron has been further prejudiced by the real expense, inconvenience, and delay caused by OHD's destruction of documents. Prejudice of this nature offers still another basis—although not a prerequisite—for granting default judgment as to OHD's liability under Counts I–IV of the Complaint. *Carlucci v. Piper Aircraft Corp.*, 102 F.R.D. 472, 489 (S.D.Fla.1984), *aff'd in part, rev'd in part*, 775 F.2d 1440 (11th Cir.1985). In justifying its entry of default judgment against a defendant corporation which had intentionally destroyed documents and had otherwise delayed and obstructed discovery, the Court in *Carlucci* held:

> The entry of default is ... appropriate because the plaintiffs' case has been severely prejudiced by the inordinate delay in getting this case to trial.
>
> ....
>
> It is not the court's function to drag a party kicking and screaming through discovery. That is what the defendant required in this case and such conduct must be deterred if the courts are to perform their intended functions.

*Id. See also Aztec Steel Co. v. Florida Steel Corp.*, 691 F.2d 480, 481 (11th Cir. 1982) (citation omitted).

Since the discovery by Telectron of the Stevens memorandum in the spring of 1981, valuable time and effort have been diverted from the litigation of Telectron's claims against OHD, because of the need to determine both the motivation behind OHD's document destruction scheme and the extent of OHD personnel involvement in that scheme. A further impediment to the fair disposition of this motion and ultimately this case has been Mr. Arnold's deceitfulness as to his role in ordering the document destruction, even after the Stevens memorandum was unearthed.

In sum, real prejudice has been shown here. Although principally caused by the document destruction itself, prejudice has also resulted from the delay associated with the Plaintiff's appropriate and, indeed, necessary inquiry into the Defendant's misconduct.

### 3. *The Inadequacy of Lesser Sanctions*

We have arrived at the decision to enter default judgment against OHD as to liability only after carefully considering the full

---

10. Where the evidence clearly reveals that an effort to destroy or conceal documents was carried out in bad faith, the drawing of an adverse inference as to the contents of the documents has not merely been permitted; it has in some cases been *required. See, e.g., Alexander v. National Farmers Organization*, 687 F.2d 1173, 1205–06 (8th Cir.1982), *cert. denied*, 461 U.S. 937, 103 S.Ct. 2108, 77 L.Ed.2d 313 (1983). In *Alexander*, the Eighth Circuit concluded that one of the parties had engaged in "a deliberate pattern of shuffling and hiding documents—to warehouses, homes or other locations—specifically to avoid discovery." *Id.* In addition, it was stipulated that this same party had ordered the destruction of certain documents, and that some of these documents had, in fact, been destroyed. *Id.* Terming these discovery abuses "outrageous," the Circuit held the trial court in error for its failure to draw factual inferences adverse to the offending party "on matters undertaken in or through offices and individuals involved in the destruction of documents." *Id.* at 1205–06 (citations omitted).

range of sanctions available for use where the rules of discovery have been willfully violated.

In weighing the appropriateness of default as a sanction in the present case, we have searched for alternative, lesser sanctions which might accomplish the triple objectives of fairly compensating Telectron for the prejudice worked upon it by OHD's wrongdoing, punishing OHD for its misconduct, and deterring future similar acts of willful disregard for the rules of discovery. Our scrutiny has led us to the conclusion that no other sanctions, alone or in concert, are equal to this task.

One lesser sanction which we have seen fit to impose as a partial remedy is the payment of all reasonable attorneys' fees and costs incurred by Telectron in ferreting out the nature, extent and source of the destruction which occurred. We apply this sanction in order to encourage wronged parties such as Telectron to take the steps necessary to uncover misconduct carried out against them in the course of litigation under the aegis of the Court. This measure standing alone, however, falls far short of making the wronged party whole, as it does not compensate Telectron for the irretrievable loss of evidence potentially crucial to its substantive claims.

By the same reasoning, the required payment of attorneys' fees and costs will not punish OHD in any meaningful way for its willful destruction efforts, nor will it effectively deter others similarly situated from undertaking acts of the same kind. We observe that OHD had been a defendant in three antitrust suits which were concluded just months before Telectron initiated its action. In at least one of these suits, judgment in excess of $1 million was entered against OHD. Faced with liability of this or perhaps greater magnitude, a corporation fearing only the imposition of attorneys' fees and costs might be sorely tempted to destroy documents thought to be potentially damaging to its interests at the outset of litigation, rather than gamble on defending itself successfully on the merits at trial.

In sum, the remedy of attorneys' fees and costs is appropriate here primarily as a step toward compensating Telectron for the wrong inflicted by OHD's actions, and more generally as an incentive to parties to investigate and expose misconduct which threatens the integrity of the discovery process. Any punitive or deterrent effect achieved by this particular sanction is secondary to these primary goals.

Another sanction available to this Court would be to foreclose OHD from offering evidence on issues related to the subject matter of the destroyed documents. This sanction's key weakness, as applied to the present case, derives from the fact that we do not know the precise contours of the destroyed materials. What we do know is that the subject matter of these materials —"sales correspondence" with OHD distributors found at the Advance division plant— cuts to the heart of Telectron's claims, all of which emanate from OHD's alleged enforcement of a "one-for-one" regimen linking the purchase of OHD door operators to the purchase of Advance radio controls. To bar the defense from proffering evidence as to OHD's communications with its distributors might effectively compel a directed verdict for Telectron on all four counts. Under these circumstances, the parties would incur substantial litigation expenses and the adjudication would consume valuable judicial resources, only to arrive at the same substantive outcome as the entry of default will achieve with much greater efficiency and at substantially lower cost. *See Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F.Supp. 1443, 1456 (C.D.Calif.1984) (entry of evidence preclusion order rejected as a Rule 37 sanction because, *inter alia*, it would compel a directed verdict for the plaintiff on several of its claims). If the evidence now available to Telectron falls short of establishing prima facie support for its claims, the argument against evidence preclusion as a sanction is even more compelling: the plaintiff would walk away from trial with nothing, having been compelled to pursue its claims without the benefit of

the probative evidence contained in the destroyed documents.

We have considered as an alternative evidentiary sanction permitting evidence of OHD's obstructive conduct to be adduced at trial. This measure would be woefully inadequate in the context of this case, however, for four reasons. First, the Plaintiff here again would be compelled to litigate its claims without the aid of possibly dispositive evidence, and the fact-finder would correspondingly be denied the opportunity to evaluate the merits of the case in light of all relevant evidence. Second, the sanction would leave too much to fortuity, since we can only speculate as to the significance which a jury might attach to evidence of willful document destruction in the context of a complex and protracted antitrust case. Third, in a case such as this, where evidence pertaining to the disputed document destruction is so varied and abundant, there is the very real risk that the destruction issue may consume the jury's attention at trial, diverting their focus from the underlying substantive issues.

Fourth and finally, merely allowing the destruction issue to be explored at trial is unlikely to serve as an effective deterrent against similar wrongdoing in the future. If the putative destroyer of discoverable documents were ever to believe that his actions, at worst, would only result in the presentation before a jury of evidence surrounding that destruction, he might well conclude that an unfavorable inference as to document destruction would be less detrimental than allowing certain evidence to be presented at trial. We have observed that a key purpose of Rule 37 sanctions must be "to insure the integrity of the discovery process." *Aztec Steel Co. v. Florida Steel Corp.*, 691 F.2d 480, 481, 482 (11th Cir.1982). A sanction which invites the unscrupulous litigant to embark upon such a cynical calculus cannot be seen as meeting this requirement. For these reasons, we cannot regard jury exposure to OHD's discovery misconduct as an effective sanction against the willful destruction of relevant evidence.

One final category of lesser-sanction analysis seeks to determine whether a given discovery abuse is such that the violating party's attorney, rather than the party itself, should be held accountable for the misconduct. "Dismissal is generally inappropriate and lesser sanctions are favored where neglect is plainly attributable to an attorney rather than to his blameless client." *Silas v. Sears, Roebuck & Co.*, 586 F.2d 382, 385 (5th Cir.1978) (citation omitted). "A party should not be punished for his attorney's mistake absent a clear record of delay or willful contempt and a finding that lesser sanctions would not suffice." *Ford v. Fogarty Van Lines, Inc.*, 780 F.2d 1582, 1583 (11th Cir.1986) (*citing Hildebrand v. Honeywell, Inc.*, 622 F.2d 179, 181 (5th Cir.1980)). Dismissals, moreover, have been reversed where the precipitating misconduct "dealt with relatively short periods of delay and few violations of court orders that may understandably have escaped the attention of the clients." *State Exchange Bank v. Hartline*, 693 F.2d 1350, 1353 (11th Cir.1982) (citations omitted).

■ The facts in the present case are notably distinct from those cases where the precipitating discovery violation was attributable to a party's counsel rather than the party itself. In *Silas v. Sears*, for example, the trial court had dismissed an individual plaintiff's employment discrimination action because of his counsel's failure to appear at a scheduled pre-trial conference and to answer interrogatories. The former Fifth Circuit, in reversing this dismissal, ruled that the record "reveal[ed] no complicity on the part of the plaintiff in the inaction of his attorney." 586 F.2d at 385. The circuit further ruled that the attorney's actions constituted neither a " 'clear record of delay' " nor evidence of " 'contumacious conduct' " by the plaintiff. *Id.* The opposing party, moreover, did not claim that its rights had been so severely prejudiced as to warrant the sanction of dismissal. *Id.* at 386. In the case at bar, the attorney who perpetrated the discovery abuses was not an independent profession-

al hired by a private individual to represent him in a particular action. To the contrary, Mr. Arnold was the Defendant corporation's full-time *in-house* counsel, who served simultaneously as secretary to the corporation. When he accepted service of Telectron's Complaint and Request for Production on April 23, 1979, and when he phoned Mr. Stevens on the same date to order the destruction of sales-related documents at Advance, he was clearly acting in his dual official capacity. Furthermore, we can only assume that Mr. Arnold's destruction order was designed, however mistakenly, to further the corporation's interests. In light of his formal and ongoing ties to OHD, Mr. Arnold's actions cannot fairly be treated as separate and distinct from those of the corporation, and the corporation can therefore not be reasonably regarded as "blameless" with respect to his actions. *Compare Silas v. Sears,* 586 F.2d at 385; *Ford v. Fogarty Van Lines,* 780 F.2d at 1583 (dismissal reversed where an attorney retained by a private individual in a personal injury action failed to file a timely pretrial order).

Even aside from Mr. Arnold's high-ranking positions at OHD, the corporation's accountability for the document destruction also derives from the fact that several OHD officials played a direct role in relaying and carrying out Mr. Arnold's order. Harold Stevens, the Advance division's General Manager, issued a memorandum ordering compliance with Mr. Arnold's directive, despite his own apparent misgivings about the directive. Mr. Stevens, moreover, destroyed sales-related documents pursuant to the order, as did two other Advance employees, Mayford Geske and Paul Buntin. Mr. Geske complied with the order in spite of finding it "somewhat unusual," upon the assurance of Mr. Stevens that it reflected "company policy." [Tr. 69; Geske Dep. at 21.]

Given these factors, we cannot simply look to sanctions applicable against Mr. Arnold as an individual attorney. The evidence leaves no doubt about his formal ties to the corporation and the involvement of other corporate officials in carrying out the destruction scheme instigated by Mr. Arnold. OHD, in short, must take responsibility for the actions of its ranking corporate officers acting within their official capacities.

Our analysis of the relevant facts and applicable legal standards has drawn us reluctantly to the conclusion that the entry of default judgment against OHD on the question of liability is the only sanction truly capable of punishing the Defendant for its willful subversion of the discovery process, and deterring others from embarking on a similar course of destroying potentially unfavorable evidence. Moreover, no lesser measure can ensure that Plaintiff's ability to litigate its claims will not be seriously prejudiced by the destruction of relevant documents. The sanction of default is therefore entered, along with the requirement that OHD bear all reasonable attorneys' fees and costs associated with the litigation of this discovery-related dispute.

### III. *OHD's "Unclean Hands" Defense*

In defending against Telectron's Motion for Default and Sanctions, OHD has argued, among other things, that Telectron is guilty of "unclean hands," because certain of its officers and personnel discarded documents during the pendency of this litigation. While the record evidence does establish that some document disposal occurred since the filing of this suit, we find absolutely no evidence that *any* of Telectron's officers or staff destroyed *any* documents in a deliberate attempt to hinder discovery efforts by OHD.

A major focus of OHD's "unclean hands" claim pertains to certain actions taken by Mr. William Foster, Telectron's Vice President and Treasurer, during the summer of 1980. Mr. Foster has described himself as the person responsible for maintaining Telectron's business records, although the actual task of reviewing Telectron's files for discovery purposes in this litigation was left to OHD's attorneys, with the assistance of Telectron's counsel. [Foster Dep. (March 31, 1982), at 12.]

During the summer of 1980, Telectron moved its Fort Lauderdale facilities to a new location in the same city. [*Id.* at 22, 46, 66.] In preparing for this move, Mr. Foster determined that some of the corporation's older records should be discarded due to limited storage space in the new building. [*Id.* at 46, 66.] While it is undisputed that Mr. Foster did actually dispose of certain documents at the time, there is strong evidence that he did so in the good faith belief that OHD had completed its review of these files and had photocopied all relevant materials.[11] It is also clear from the evidence that Mr. Foster, in discarding certain records, adhered to Telectron's pre-existing document retention policy, which called for the preservation of corporate records for a minimum of seven years, in conformity with the presumed mandates of the Internal Revenue Service. [Foster Dep. at 15; Arthur Horvath Dep. at 49; John J. Lucca Dep. at 53; Tr. 483.][12]

Our belief that Mr. Foster acted in good faith is not at all tantamount to an endorsement of his sense of judgment; nor is it a denial of the fact that records potentially useful to OHD may have been destroyed by his actions. [*See* Defendant's Proposed Order Denying Telectron's Motion for Sanctions, at 52.] We simply observe that nothing in Mr. Foster's actions rises to a level of calculated mischief sufficient to give credence to OHD's assertion of "unclean hands."

Similarly ill-suited to an "unclean hands" defense is OHD's contention that Arthur Horvath, a Telectron vice president in charge of the company's Cleveland operations, had improperly destroyed records at Telectron's plant in Cleveland, Ohio. Among the records discarded by Mr. Horvath were the correspondence files of a former Telectron vice president and sales manager, Frank Oates, who left the company in 1978. [Defendant's Proposed Order Denying Telectron's Motion for Sanctions, at 53; Horvath Dep. at 12.] Mr. Horvath's candor in acknowledging that he had disposed of these files contrasts dramatically with Mr. Arnold's disingenuous representation that he could not recall having ordered the destruction of documents at Advance. [Horvath Dep. at 12–13.] A further crucial distinction lies in the timing of Mr. Horvath's actions. Whereas Mr. Arnold ordered the destruction of key documents immediately after being served with Plaintiff's Complaint and Request for Production, Mr. Oates' correspondence was disposed of in June 1979, five months *prior* to Telectron's receipt of OHD's first and only Request for Production, on November 8, 1979. [Horvath Dep. at 13; Defendant's

---

11. Mr. Foster testified that he had been personally advised by OHD's outside counsel, Mr. Barkett of the Miami law firm of Steel, Hector and Davis, that OHD had completed its review of the files in the old building:

Q: Was it your understanding at the time you destroyed the documents during the move from the warehouse that the Overhead Door attorneys were through with those documents?
A: Yes.
Q: Where did you get that impression?
A: From Mr. Barkett.
Q: What did he say to you?
A: As I remember, I asked if they were—had completed their review of all of the documents in the shipping building.... He said, "Yes, we are through."

[Foster Dep. at 63.]

At the evidentiary hearing held before this Court in March 1986, no witness was presented to refute Mr. Foster's assertion that he believed in good faith that OHD had concluded its inspection of files at the Fort Lauderdale facility. We also have no basis for doubting his declaration that he had not been advised that Telectron and OHD had signed an agreement to preserve all documents produced pursuant to the various requests for production. [Foster Dep. at 37, 47, 70–71; Defendant's Ex. 25 (Letter of Agreement, February 4, 1980).] Unaware of this agreement, Mr. Foster faithfully adhered to Telectron's preexisting document retention policy, which called for the preservation of corporate records for a minimum of seven years, in conformity with the mandates of the Internal Revenue Service. [Foster Dep. at 15; Arthur Horvath Dep. at 49; John J. Lucca Dep. at 53; Tr. 483.]

12. Mr. Foster, in sifting through the files at the old Fort Lauderdale facility, took pains only to throw away documents dated prior to 1973—i.e., in full compliance with these guidelines. [Foster Dep. at 22–23, 43–44.] Moreover, Mr. Foster retained pre–1973 records which he regarded as being "of a permanent nature." [*Id.* at 43–44.]

Ex. 20 (OHD Request for Production).][13] In light of these circumstances, we are at a loss to find even the slightest hint of willful wrongdoing on Mr. Horvath's part.[14]

OHD additionally maintains that Lester Norman and Harry Sundberg, two of Telectron's regional sales representatives, discarded documents possibly relevant to OHD's Request for Production, subsequent to Telectron's receipt of the Request in November 1979. [Defendant's Proposed Order at 55–58.] None of the evidence shows that the two sales representatives, both of whom worked out of their homes, bore any responsibility for retaining corporate documents beyond the time of their immediate use. [Sundberg Dep. at 76–79; Norman Dep. at 21–24.] Moreover, there is no intimation that these individuals were acting under Telectron's instructions when they periodically cleaned out their files. [Sundberg Dep. at 9, 37; Norman Dep. at 22.]

As yet another basis for declaring Telectron unfit to prevail in its Motion for Default and Sanctions, Defendant claims that Telectron's counsel had represented to opposing counsel, without clear knowledge, that all documents sought by OHD from the office of Telectron's President, John Lucca, in Hammonton, New Jersey, were also available at Telectron's facility in Fort Lauderdale. [Defendant's Proposed Order at 61–63.] While this representation does appear to have been based upon the opinion of John Lucca rather than upon a careful inspection of files at Hammonton and Fort Lauderdale by Telectron's counsel, the record evidence fails to establish that any documents generated in Hammonton or Cleveland, other than occasional handwritten notes, had not been duplicated and sent to Fort Lauderdale. [Tr. 501–502; Horvath Dep. at 31–35, 42; Lucca Dep. at 59–62.] In any case, as OHD's counsel were given a full opportunity to inspect all documents in Hammonton and Cleveland, there is no indication whatsoever that documents were lost as a result of this representation. [Lucca Dep. at 43–44, 47; Horvath Dep. at 45–46.]

Viewing OHD's allegations both as a series of separate claims and in the aggregate, we are unable to find any plausible factual basis for upholding their "unclean hands" defense. The threshold for a valid "unclean hands" defense has been clearly stated:

> It is well settled that it is only fraud or willful misconduct which bars one from recovering in a court of equity under the maxim, "He who comes into equity must come with clean hands." The maxim refers to willful misconduct rather than merely negligent misconduct.

*Eresch v. Braecklein*, 133 F.2d 12, 14 (10th Cir.1943), *citing* 30 C.J.S. Equity, § 95a. This tough standard, well-stated by the Tenth Circuit in *Eresch v. Braecklein*, continues to adhere today. *See, e.g., Wells Fargo & Co. v. Stagecoach Properties, Inc.*, 685 F.2d 302, 308 (9th Cir.1982) ("[b]ad intent is the essence of the 'unclean hands' defense.").

In the evidence presented to this Court, we find absolutely no support for the proposition that the Plaintiff has

---

**13.** Mr. Horvath also believed that Mr. Oates' correspondence was copied and sent to Telectron's Fort Lauderdale storage facility—a belief corroborated by Defendant's acknowledgment that Telectron did, in fact, produce "numerous Frank Oates' documents" in Fort Lauderdale. [OHD's Memorandum of Law in Opposition to Motion for Default and Sanctions, at 48 n.; Horvath Dep. at 31–33.]

**14.** Also possibly destroyed by Mr. Horvath or his secretaries were copies of old invoices pertaining to the Ray-Dor corporation, a garage door operator plant which was acquired by Telectron in 1974. [Horvath Dep. at 4–5.] These Ray-Dor documents, discarded pursuant to Telectron's seven-year retention policy in the beginning of 1980 and 1981, were dated no more recently than 1972, and therefore pre-dated Ray-Dor's acquisition by Telectron. [*Id.* at 25.] It is difficult for us to comprehend what bearing these files, pertaining to a then-unrelated business entity, might have had on Telectron's claims against OHD. Moreover, as Mr. Horvath was unaware of the suit against OHD at the time that the Ray-Dor documents were destroyed, his actions cannot be seen as part of a willful attempt to obstruct the discovery process or to conceal documents relevant to the case. [*Id.* at 25.]

**140**

sought equitable relief with unclean hands. Not even the slightest indication of willful misconduct or bad faith emerges from the testimony regarding Telectron's disposal of certain records.

In light of the absence of any support for the Defendant's argument, we cannot attach any legal significance to the "unclean hands" defense.

\* \* \* \*

For the reasons set forth above, the sanctions outlined at the commencement of this Order are hereby imposed upon the Defendant, Overhead Door Corporation.