698 So.2d 563 (1997)
FIGGIE INTERNATIONAL, INC., d/b/a Safway Steel Products, Inc., Appellant,
v.
Dennis Troy ALDERMAN, et al. Appellees.
No. 96-895.
District Court of Appeal of Florida, Third District.
July 16, 1997.
Rehearing Denied September 17, 1997.
Hinshaw & Culbertson; Russo & Talisman and Elizabeth K. Russo and Patrice A. Talisman, Coconut Grove, for appellant.
Barbara Green, Coral Gables; David Mishael, Miami; Roy D. Wasson, Miami; Kutner, Rubinoff, Bush & Lerner and Susan S. Lerner and Arno Kutner, Miami; Lawrence Rodgers, Miami; and Stephen Epstein, Garden City, NY, for appellees.
Before SCHWARTZ, C.J., and JORGENSON and GODERICH, JJ.
PER CURIAM.
The defendant below, Figgie International Inc., d/b/a Safway Steel Products, Inc., appeals under Fla.R.App.P. 9.130(a)(3)(C)(iv) from an order striking its pleadings and entering a default against it as a result of willful discovery violations. Because the trial court's order documents with specificity the egregious discovery violations committed by the defendant and because, under the circumstances, the trial court imposed a proper sanction, we affirm and adopt the trial court's order as the opinion of this Court:

*564 ORDER GRANTING PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT AND FINAL DEFAULT JUDGMENT

THIS MATTER having come before the Court for hearing on March 6, 1996 on the Plaintiffs' Motion for Entry of Default Judgment Against Defendant, Figgie International, Inc. d/b/a Safway Steel Products ("Safway"), the Court having considered said motion, having received evidence and heard argument of counsel thereon, and having considered the memoranda of law filed by the parties on said motion, having determined that the Defendant Safway has through the course of this litigation engaged in a pattern of willful discovery violations including destruction of relevant documents which it had a duty to preserve, the presentation of false testimony, and other deliberate obstruction of the discovery process for which the only adequate remedy is the striking of pleadings and the entry of a default judgment, the Court finds and concludes as follows:
INTRODUCTION
1. The Court is aware that the striking of pleadings or entering a default for noncompliance with discovery obligations is the most severe sanction which should be employed only in extreme circumstances. Mercer v. Raine, 443 So.2d 944 (Fla.1983).
2. This Court recognizes that its discretionary authority to enter severe sanctions such as entry of a default may be exercised only upon making express findings of the willful failure to comply with discovery obligations. E.g. Commonwealth Fed. Sav. & Loan Ass'n v. Tubero, 569 So.2d 1271 (Fla.1990).
3. However, in the more than thirty-five years that the Court has been on the bench and engaged in the practice of law, the facts of the present case present the most egregious case of discovery abuse this Court has ever seen.
FINDINGS OF FACT
1. This is a personal injury action arising out of an incident which occurred on May 16, 1989, when Dennis Alderman was rendered quadriplegic after falling from a scaffold, which Plaintiff alleges was manufactured by Defendant Safway.
2. No warning labels were affixed to the scaffold from which Plaintiff fell.
3. On October 27, 1989, the Plaintiffs served Safway with the Amended Complaint, Request for Production and Interrogatories.
4. The Plaintiffs Request for Production served on October 27, 1989 requested, among other things, safety information including "each and every ... document which in any way mentions, describes or otherwise refers to any change or suggested change or modification in the design ... according to which the ... scaffold was manufactured ... [,] each and every ... document which in any way mentions ... any possible use or foreseeable misuse of [the] scaffolding ...[,] each and every ... document which refers to any falls and injuries sustained by [scaffold] users ... [,] each and every ... document which mentions, describes, or in any way refers to any precaution taken by Defendant and its parent company in order to prevent any harm due to the use of ... open end sectional scaffolding from 1965 to the present.. [, and e]ach and every `product safety engineering report' or `similar' memo or document which in any way concerns Safway open ended frame sectional scaffold and its guardrail, cross bracing, planking, and safety net accessories from 1975 to May 16, 1989." (emphasis added).
5. Safway did not produce a single document in response to that Request for Production, objecting to the request for design change documents as overbroad and answering "none" to the requests for documents pertaining to other falls and to safety-related documents.
6. The Plaintiffs initial set of Interrogatories, also served with the amended complaint on October 27, 1989, asked whether Safway had retained consultants (human or safety engineers or independent laboratories) to assist in matters of safety regarding scaffolding.
7. Safway's initial response which was signed by Safway's product safety director, *565 David Burkhardt and dated January 30, 1990, contained objections based on the number of interrogatories propounded.
8. Then-presiding Judge Thomas G. O'Connell overruled Safway's objections and ordered responses. Safway then listed only its own in-house engineering department and Underwriters Laboratories pre-dating 1976.
9. The plaintiffs served additional Interrogatories on March 27, 1991 again asking whether Safway had employed or consulted with human or safety engineers to assist in devising warnings or precautions in using Safway's sectional scaffolding.
10. David Burkhardt, Safway's product safety director, answered and signed those Interrogatories, listing only himself in answer to question 13.
11. Interrogatory 14 asked whether any independent laboratories had recommended safety features for the sectional scaffolding to which Safway responded, "No."
12. Unknown to the Plaintiffs at the time of that answer, Safway in 1983 had contracted with an outside human factors expert named Dr. Dan Johnson and his company Interaction Research Corporation.
13. Safway had retained Johnson to work on developing warning labels for the open end frame sectional scaffolding at issue in this case.
14. In connection with this warning label project, Safway's product safety director, David Burkhardt, sent Dr. Johnson accident data which Burkhardt himself had compiled.
15. The Safway-commissioned warning label project also generated "bookshelves of questionnaire data and analyses," approximately 8 to 10 four inch binders worth of material.
16. In addition, Dr. Johnson and Interaction Research Corporation submitted a report dated February 1986 to Mr. Burkhardt entitled "THE DEVELOPMENT OF WARNING LABELS FOR STANDARD SCAFFOLDS, ROLLING TOWERS AND LADDERS."
17. Thus, at the time the Plaintiffs served their first Request for Production and Interrogatories, Safway knew of the existence of vast amounts of material pertaining to its pre-accident efforts to create warnings on the subject scaffold as well as accident data compiled by Mr. Burkhardt himself.
18. Safway had either actual possession or control over this material, which was relevant to this lawsuit and within the scope of Plaintiffs' discovery requests.
19. None of these materials was produced nor their existence acknowledged or disclosed in Safway's discovery responses.
20. The Plaintiffs thereafter learned that Safway's Product Safety Director, David Burkhardt, took actual possession of the documents associated with the 1983-1986 Johnson-Interaction research project in early 1990, shortly after the Aldermans filed suit.
21. Dan Johnson testified that in 1990 he returned eight to ten 4" binders of material to David Burkhardt, whereas Mr. Burkhardt claimed to recall only two to three 1" to 2" binders.
22. By a recent Court order, Mr. Burkhardt was required to submit to another deposition, on February 15, 1996, to explain the whereabouts of these binders.
23. At this deposition, Mr. Burkhardt stated he kept the binders in his office and over the course of the next three years went through the documents "a few pages at a time" and threw them away without regard to their relevance to either the pending litigation or the specific discovery requests in this litigation.
24. Mr. Burkhardt testified that when he disposed of the documents, he did not review them to determine whether they had been requested in pending litigation, although he stated that he was generally familiar with the discovery requests which had been made of Safway by Plaintiff in this case at the time.
25. In 1989, the Scaffolding Industry Association (S.I.A.) commissioned Dan Johnson to develop a warning label for all scaffold products, including the type involved here.

*566 26. David Burkhardt served as the liaison between Johnson and the S.I.A. Again, Johnson generated a report dated February 22, 1991 entitled, "Development of A Warning Label For Scaffolds."
27. Johnson sent this report along with "a warning file" associated with the study to Burkhardt.
28. Johnson did not retain a copy of that "warnings file" and Burkhardt destroyed the original.
29. Mr. Burkhardt has been the director of product safety at Safway for 13 years and has been involved in investigating or reviewing injuries occurring during the use of scaffold products manufactured by Safway since 1981.
30. Since 1981, Mr. Burkhardt has opened six to twelve files each year involving scaffold injuries.
31. Mr. Burkhardt is intimately familiar with the discovery and litigation process, testifying in 100 to 200 cases by deposition and formulating responses to Requests for Production and Answers to Interrogatories in a like number of cases, and testifying at trial more than a dozen times.
32. Armed with that degree of sophistication, Mr. Burkhardt engaged in a pattern of false and evasive deposition testimony calculated to conceal Safway's pre-accident efforts to develop warning labels and the past existence of the warning label and accident data documents.
33. When the Plaintiffs first deposed David Burkhardt on April 25, 1994, Mr. Burkhardt testified that he had devised drafts of warning labels in the 1980's before Dennis' accident, but that his drafts were "probably long gone."
34. Mr. Burkhardt testified further that there was no documentation anywhere to show the progression of what he felt might be a label that could be placed on the type of scaffolding at issue.
35. In truth, drafts of Safway's proposed warning labels are contained within the February 1986 report generated at the end of Dan Johnson's Safway-commissioned study, which report has been in Burkhardt's personal possession, within his easy reach, since 1986.
36. At the April 25, 1994 deposition, Mr. Burkhardt also denied that Safway had ever consulted an outside human factors consultant prior to 1990. Mr. Burkhardt also denied ever speaking to Dan Johnson any earlier than 1989.
37. Thus, some four years after Mr. Burkhardt knowingly and intentionally destroyed the documents generated during Johnson's mid-1980's warning label project which had been commissioned by Safway through Mr. Burkhardt's efforts directly, Mr. Burkhardt denied under oath that he had ever had any contact with Dan Johnson prior to late 1989.
38. It was not until Mr. Burkhardt was deposed again, six months later on September 8, 1994, that Mr. Burkhardt, upon further inquiry by Plaintiffs' counsel, acknowledged previous contact with Dan Johnson prior the S.I.A. relationship in the 1990's, finally admitting that in the mid-1980's Safway had hired Dan Johnson as an expert for litigation in Green Bay, Wisconsin.
39. However, Mr. Burkhardt knowingly misrepresented the true nature of Safway's other mid-1980's contact with Dan Johnson, testifying that he contacted Johnson "to see if we could develop some pictorial-type instructions on erecting scaffolds, rather than just verbiage," but making no mention of the critical fact that Johnson's research was in connection with scaffold warning labels.

40. When Plaintiffs' counsel tried to question Mr. Burkhardt about this new disclosure, Mr. Burkhardt was evasive, testifying that he and Mr. Johnson may have "talked on the phone a few times" and "sat down together a time or two."
41. When Plaintiffs' counsel pressed Mr. Burkhardt for more details about the contact he had with Dr. Johnson between 1981 and 1986, Mr. Burkhardt responded, "I have no recall at all."
42. Finally, when plaintiffs' counsel tried to question Mr. Burkhardt about the nature of Dan Johnson's mid-1980's research *567 efforts, Safway's counsel improperly instructed Mr. Burkhardt not to answer.
43. Safway's pattern of discovery violations was repeated in its September 14, 1994 responses to the Plaintiffs' Second Request for Productions served August 15, 1994:
Plaintiffs' Second Request for Production
18. Any and all correspondence sent to Human Factors Engineer, Dan Johnson, regarding the design of warnings to be used on sectional scaffolding.
Safway's Responses served September 14, 1994
18. Will be produced.
[Request] 20. All drafts of warning labels or their contents received from Dan Johnson, Human Factors Engineer.
[Response] 20. Will be produced.
[Request] 21. All drafts of warning labels or their contents sent to or submitted to Dan Johnson.
[Response] 21. Will be produced.
[Request] 22. All "warnings" files associated with any warning labels used, or contemplated to be used on sectional scaffolding and its component parts.
[Response] 22. There are no warnings other than those that have been produced and none are contemplated.
44. It was not until September 30, 1994 when the Plaintiffs traveled to Washington State and deposed Dan Johnson that they began to uncover the truth; Dr. Johnson testified that in the mid-1980's Safway had in fact commissioned him and his company, Interaction Research Corporation, to work on warning labels which in turn generated a series of documents turned over to Mr. Burkhardt at Safway.
45. One week after Johnson's deposition, the Plaintiffs went before then-presiding Judge Harold Solomon on a motion to compel Safway to produce these documents. Safway argued against production on grounds of relevance, an argument which the Court rejected.
46. Of course, at that point in time, Safway no longer had the documents as Mr. Burkhardt had destroyed them without regard to their relevance.
47. The fact that the documents had once existed but had been destroyed was a fact of which Safway had yet to notify its attorney, as evidenced by Safway's counsel arguing before the Court against this documentation production based on relevance alone.
CONCLUSIONS OF LAW
1. Even absent an order determining that the evidence must be preserved or produced in discovery, Safway had a duty to preserve evidence in this case, including the eight to ten binders filled with data, the "bookshelves" of questionnaire data and analyses, and other accident data, all of which were fairly within the scope of Plaintiffs' discovery requests, in that the duty of a litigant to preserve relevant evidence is established by the opposing party's submission of a discovery request identifying documents of the same subject matter as those which the receiving party possesses: "[D]ocument-production requests put the parties on notice that documents should be preserved, regardless of the spoliator's subjective intent." Jamie Gorelick, Stephen Marzen, and Lawrence Solum, Destruction of Evidence, § 3.11 (1989)(citing Wong v. City & County of Honolulu, 66 Haw. 389, 665 P.2d 157 (1983)).
2. Even absent the violation of an order determining that evidence must be preserved or produced in discovery, a trial court has the inherent power to sanction destruction of that evidence. E.g., Telectron, Inc. v. Overhead Door Corp., 116 F.R.D. 107 (S.D.Fla.1987); see generally, Anderson v. State, 267 So.2d 8 (Fla. 1972)(court has inherent authority "to do all things that are reasonably necessary for the administration of justice within the scope of its jurisdiction").
3. Apart from the sanctionability of Safway's document destruction, Safway engaged in a pattern of deception further established by the false and evasive deposition testimony of its representative, Product Safety Director, David Burkhardt.
4. The ultimate sanctions of dismissal or default are justified by the repeated *568 presentation of false testimony under oath which is ultimately uncovered by the assiduous efforts of opposing counsel. O'Vahey v. Miller, 644 So.2d 550 (Fla. 3d DCA 1994), rev. denied, 654 So.2d 919 (Fla. 1995).
5. Safway's conduct in destroying the documents and in presenting false testimony and in otherwise obstructing the discovery process has been willful and in bad faith.
6. Sanctions lesser than the entry of a default judgment against Safway cannot restore Plaintiffs to the position they would have occupied in the absence of Safway's willfulness and bad faith.
7. Plaintiff's motion is granted, all Answers and Affirmative Defenses filed by the Defendant, Figgie International, Inc. d/b/a Safway Steel Products, are stricken, and a final default judgment is entered against said Defendant, damages to be awarded by the jury, with costs to be taxed in Plaintiff's favor upon appropriate motion.
DONE AND ORDERED in open court at Miami, Dade County, Florida, on this the 7 day of March, 1996.
 /s/ Murray Goldman
 CIRCUIT COURT JUDGE
 MURRAY GOLDMAN
(emphasis and alterations in original).
Affirmed.